**Raymond R. WISKOTONI,
Plaintiff-Appellee,**

v.

**MICHIGAN NATIONAL BANK–WEST,
Defendant-Appellant.**

**No. 81–1719.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 19, 1983.

Decided Sept. 8, 1983.

---

Jeffrey H. Beusse (argued), Cholette, Perkins & Buchanan, Grand Rapids, Mich., for defendant-appellant.

John F. Foley (argued), Gergely & Foley, Vicksburg, Mich., for plaintiff-appellee.

Before MERRITT and WELLFORD, Circuit Judges, and PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

Michigan National Bank-West (Bank) appeals the district court's denial of its motions for judgment NOV, remittitur, and for a new trial following the entry of a judgment on a jury verdict for $64,932 for damages arising from the Bank's termination of one of its branch managers, Raymond R. Wiskotoni. Wiskotoni claimed that his discharge was in violation of the terms of an implied employment contract and Michigan public policy.

This appeal raises numerous issues including whether Michigan public policy would be violated by the discharge of an employee for being subpoenaed to testify before a grand jury, whether an employment contract prohibiting arbitrary discharges could be implied by the Bank's employment manual and practices, whether the National Bank Act bars Wiskotoni's recovery under state contract or tort law, whether in this case the jury could award damages for loss of reputation and for mental anguish, and whether the evidence supported the jury's verdict.

## I. Background

In September, 1975 Gary Johnson, then president of the Bank, hired Wiskotoni as a branch manager. At the time of his hiring, Wiskotoni was given an Employees Personnel Handbook. The handbook stated that employment would be on a probationary basis for three months and that during the probationary period employment could be terminated "without any other reason" than that the employee is "not suited to the work of the Bank."

Wiskotoni held the position of branch manager at several branches of the Bank. By the autumn of 1977 Wiskotoni was the manager of the Bank's South Westnedge branch in Kalamazoo, Michigan. Wiskotoni held this position when terminated by the Bank on February 28, 1978.

In October, 1977 Federal Bureau of Investigation agent Gerard Alexander met with Peter Knibloe, Bank president, and Felix Osorno, Bank vice-president. At this meeting Alexander informed the Bank officers that he had received information from a source of unknown reliability that Wiskotoni was involved in a Kalamazoo numbers operation. Alexander indicated that the in-

formant, a prostitute, had alleged that Wiskotoni helped finance the operation by cashing checks in the morning, holding them all day, and tearing up the checks at the end of the day when the cash given for the checks was returned to the bank, i.e., by making what in effect were one-day loans.

Over the next few weeks Alexander and bank officers met several times to discuss several cases of embezzlement by Bank employees other than Wiskotoni. At each meeting, the action to be taken in the Wiskotoni matter was discussed. At one of the meetings, Knibloe informed Alexander that there were no acceptable means by which to discover whether Wiskotoni was making the loans. In early November, 1977, Alexander informed the Bank officers that because it appeared that additional information could not be obtained in the Wiskotoni matter, the Bureau's investigation of Wiskotoni was being ended.

On December 16, 1977, Wiskotoni was subpoenaed by the Kalamazoo County Circuit Court grand jury to testify on December 22. The proceeding was adjourned and Wiskotoni did not appear before the grand jury until January, 1978. On December 16, 1977 Osorno was also subpoenaed to appear before the Kalamazoo County Circuit Court grand jury and to produce the Bank's records relating to Peter Stamos, a personal friend of Wiskotoni. Additionally, Osorno was ordered to produce Wiskotoni's personnel records.

On December 27, 1977, Knibloe and Osorno met with Wiskotoni. At the meeting Knibloe informed Wiskotoni that he was to be terminated as of March 1, 1978. Among the reasons that Knibloe gave for the termination was that the Bank had received information that Wiskotoni was involved in the numbers rackets. Wiskotoni denied any involvement with the numbers rackets and offered to take a lie detector test to clear himself. Knibloe refused Wiskotoni's offer.

Wiskotoni remained the branch manager at the South Westnedge branch of the Bank with full responsibilities. On February 28, 1978, Wiskotoni was finally terminated from the Bank. No indictment was ever returned involving Wiskotoni.

On September 13, 1978, Wiskotoni filed suit against the Bank for damages arising from the termination. At trial, Wiskotoni contended that his discharge breached the terms of an implied employment contract and violated Michigan public policy. Wiskotoni argued that an employment contract prohibiting arbitrary discharge was implied by the Bank's employment manual and practices. Wiskotoni also argued that the bank discharged him because he had been subpoenaed to testify before a grand jury and that such a termination violated public policy. The jury in its answers to special interrogatories found for Wiskotoni on both the tort and the contract claims and awarded Wiskotoni damages of $64,932. The trial court denied the Bank's post-trial motions for judgment NOV, remittitur, and new trial. The Bank filed this timely appeal.

## II. Public Policy

One of the theories that Wiskotoni advanced at trial was that he was terminated by the Bank because he had been subpoenaed to appear and testify before a state grand jury and that such a termination was contrary to the settled public policy of the state of Michigan. The trial judge gave the following instruction on the theory:

> You are instructed that the law on this subject is, that it is the law in the State of Michigan which is applicable, that it's a violation of public policy to terminate an employee for the reason that he was subpoenaed to appear before a grand jury. To prevail on Count 1, that is the public policy count, the Plaintiff must prove by a preponderance of the evidence as follows: First, that he was employed by the Defendant bank. Secondly, that the Plaintiff's employment was terminated by the Defendant; and third, that the Defendant terminated the Plaintiff's employment for the reason that Plaintiff was subpoenaed to appear before the grand jury.

Trans. at 161.

On appeal, the Bank argues that its discharge of Wiskotoni was not actionable as a

violation of public policy because Wiskotoni, the Bank contends, was one of the subjects of the grand jury investigation for which he was issued a subpoena.[1] This argument raises two specific issues: (1) does the jury instruction accurately state the law of Michigan and (2) was the evidence sufficient to support a finding that Wiskotoni was terminated for being subpoenaed to appear before the grand jury.

As a preliminary point we note that the issue is not whether the district court erred in failing to instruct that Michigan public policy was not violated by Wiskotoni's termination if the reason for that termination was his being subpoenaed to appear before a grand jury as a possible target of the investigation. The trial judge adopted the substance of the Bank's proposed jury instructions on the public policy issue.[2] More importantly, the Bank failed to object to the jury instructions that were given and is thereby barred from assigning the matter as error on appeal.[3] *Batesole v. Stratford,* 505 F.2d 804, 807 (6th Cir.1974) (applying Fed.R.Civ.P. 51).

■ The Bank nevertheless contends that the jury instructions were clearly erroneous. This court has acknowledged that where an error in jury instructions was "obvious and prejudicial" an appellate court may consider the matter "in the interests of justice." *Id.* at 808. We do not find that the instructions were clearly erroneous.

■ In *Suchodolski v. Michigan Consolidated Gas Co.,* 412 Mich. 692, 695, 316 N.W.2d 710, 711 (1982) (per curiam), the Supreme Court of Michigan recognized an exception to the general rule that an employment contract for an indefinite term is terminable at will "based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." The court in *Suchodolski* stated that public policy proscriptions of employment discharges ordinarily are based on one of three grounds: (1) explicit legislative statements prohibiting the discharge of employees who exercise a statutory right or perform a statutory duty, *e.g.,* The Whistleblowers' Protection Act, Mich.Comp.Laws § 15.362; (2) legislative statements of public policy that imply a cause of action for wrongful termination, *e.g.,* refusal to violate a law in the course of employment; and (3) an implied public policy prohibition of a discharge in retaliation for an employee's exercise of a legislatively conferred right, *e.g.,* filing of workers' compensation claims. 412 Mich. at 695–96, 316 N.W.2d at 711–12. The court's statements indicate that Michigan requires the location of some legislative enactment to ground a finding

1. The dissent accepts as demonstrated the Bank's contention that Wiskotoni "was not simply subpoenaed to testify as a witness with pertinent information ... [but] was a supposed *target* of the investigation ...." *Infra* at 393–94. We can discern no hint of such a finding in the record. Moreover, the testimony cited by the Bank does not compel such a finding. Transcript at 17–19 (testimony of Wiskotoni); *id.* at 64–65 (testimony of Alexander). It is not surprising that the Bank's contention can, at best, be characterized as speculative because Michigan provides statutory protection for the confidentiality of the activities and objectives of its grand juries. Mich.Comp.Laws §§ 767.3 & 767.4 (one-man grand jury); *id.* § 767.19f (grand jury).

2. The Bank submitted the following as part of its proposed jury instructions:

I instruct you that if you find that the sole and only reason for the Plaintiff's dismissal was because he was subpoenaed as a witness to give testimony before the Grand Jury, you should hold that the Plaintiff's dismissal was against the public policy of this State. On the other hand, if you find that the Plaintiff was dismissed by the Bank because of the fact that Mr. Knibloe's confidence in the Plaintiff had been destroyed because of the information furnished to him by the FBI with regard to the Plaintiff's alleged personal involvement in the numbers racket investigation, you should find for the Bank as to Count 1.

3. The Bank's sole objection with respect to the instructions on the public policy issue concerned the decision of the district court not to instruct the jury as follows:

It is the law in the State of Michigan that it is a violation of public policy to terminate an employee solely because he was subpoenaed to appear before the grand jury.

The difference between this instruction and that given concerned the use of the term "solely". Trans. at 119–23.

that a discharge is in breach of public policy. *See Schipani v. Ford Motor Co.,* 102 Mich.App. 606, 615, 302 N.W.2d 307, 313 (1981).

The Michigan legislature has enacted numerous statutes establishing and protecting the grand jury system. Grand juries are created pursuant to Mich.Comp.Laws § 767.6 *et seq.;* one-man grand juries are authorized by Mich.Comp.Laws § 767.3 *et seq.* Witnesses are compelled to appear before the grand jury and may be punished for failure to appear and to testify. Mich. Comp.Laws §§ 767.5, 767.19c. Witnesses are subject to penalties for perjury. Mich. Comp.Laws § 767.19d. Possession, use or disclosure of grand jury proceedings is illegal. Mich.Comp.Laws §§ 767.4a, 767.19f. These legislative enactments clearly indicate that the protection of the grand jury system is a part of Michigan public policy. That system would be affected adversely if an employer could discharge with impunity an employee for the reason that the employee had been called to appear and testify before a grand jury. *Cf. Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975) (termination of employee for serving on jury creates cause of action for wrongful discharge in violation of Oregon public policy protecting the petit jury system). Moreover, these legislative statements of public policy clearly imply the existence of a cause of action for wrongful discharge where the reason for the discharge is that the employee has been subpoenaed to appear and testify before a grand jury. *Cf. Clifford v. Cactus Drilling Corp.,* 109 Mich.App. 776, 312 N.W.2d 380 (1981) (because Michigan public policy as expressed in workers' compensation statutes is to compensate employees for work-related injury, termination of employee for excessive absenteeism arising from work-related injury violates public policy.) Accordingly, the jury instruction on Wiskotoni's public policy tort claim was not erroneous.[4]

The Bank also contends that the jury verdict that the Bank violated public policy is unsupported by the evidence. In this circuit, in cases in which jurisdiction is predicated on diversity the applicable state law as to sufficiency of evidence is applied. *Moskowitz v. Peariso,* 458 F.2d 240, 244 (6th Cir.1972). In Michigan the standard of sufficiency of evidence to support a jury verdict is clear: if reasonable men could differ as to the meaning of the evidence when the facts are viewed in the light most favorable to the prevailing party, the evidence is sufficient to support the verdict. *Birou v. Thompson-Brown Co.,* 67 Mich.App. 502, 509, 241 N.W.2d 265, 269 (1976); *Holliday v. National Dairy Products Corp.,* 50 Mich. App. 366, 370, 213 N.W.2d 289, 291 (1973).

As the trial judge noted in his opinion denying the Bank's motion for judgment NOV, there was a factual dispute as to the reason for Wiskotoni's discharge. Wiskotoni claimed that the reason was that he had been subpoenaed to testify before a grand jury, while the Bank contended that Wiskotoni was discharged because of its suspicion of Wiskotoni's involvement in the numbers rackets and its fear of adverse publicity.

Knibloe's refusal to consider the results of a polygraph test which Wiskotoni offered to undergo provides considerable evidence that the real reason for the discharge was not its suspicion of Wiskotoni's involvement with the numbers rackets. Additionally, the Bank's continuation of Wiskotoni as manager of the South Westnedge branch with undiminished responsibilities even after it had notified him of his termination supports the inference that the suspicion of Wiskotoni's involvement in illegal activities did not play a role in Wiskotoni's termination. Finally, as the district court noted in its order denying the Bank's motion for judgment NOV and remittitur:

> The uncontested timing of the events provides evidence from which the jury could infer that the subpoena, rather than the underlying suspicion, was the

4. The Bank argues on appeal that the National Bank Act, 12 U.S.C. § 24 (Fifth), indicates that Michigan public policy would permit a national bank to discharge its employees with immunity from state imposed liability. The Bank's argument ignores the fact that the scope of the applicability of § 24 (Fifth) is limited to the Bank's officers. See Section IV *infra.*

motivation for the discharge. The accusation of plaintiff's involvement in a numbers operation was first brought to the attention of bank officials in late September or early October, 1977. No action was taken immediately, though defendant's evidence would tend to explain that the Bank's officials were taking that time to make a difficult decision. Plaintiff and certain bank records were subpoenaed by the Grand Jury on December 16, 1977, and plaintiff was both informed of his impending discharge and first confronted with the underlying accusations on December 27, 1977. However, his discharge was not effective until March 1, 1978, and he continued working as a branch manager with undiminished responsibility until that date. From this evidence and the conflicting testimony of the witnesses, the jury could, and apparently did, determine that the true reason for plaintiff's discharge was the one that violated public policy, and not the others proffered.

Appendix at 181–82. We agree with the district court that the evidence was not uncontroverted, and alternative inferences could have been drawn by the jury, but we conclude that the evidence was sufficient to support the inferences that the jury drew. Accordingly, the district court did not err in denying the Bank's motion for judgment NOV with respect to the public policy claim.

### III. Breach of Contract

The traditional view of oral employment contracts and employment contracts for an indefinite period or term is that such contracts are terminable at will. *See, e.g., Crownover v. Sears, Roebuck & Co.,* 594 F.2d 565 (6th Cir.1979) (construing Michigan law); *Lynas v. Maxwell Farms,* 279 Mich. 684, 273 N.W. 315 (1937). In *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980), the Supreme Court of Michigan limited the traditional view and held "that employer statements of policy ... can give rise to contractual rights in employees without evidence that the parties mutually agreed that the policy statements would create contrac-

tual rights in the employee...." *Id.* at 615, 292 N.W.2d at 892. *See generally 1981 Annual Survey of Michigan Law,* 28 Wayne L.Rev. 739–43, 970–73 (1982) (discussing *Toussaint*).

At trial, Wiskotoni argued that an implied employment contract existed between the Bank and himself, that one term of that contract was that Wiskotoni would be discharged only for cause, and that his discharge was in violation of that contract because it was not for cause. The jury in its answers to the special interrogatories agreed with Wiskotoni.

■ On appeal, the Bank's principal contention is that the district court misconstrued *Toussaint* in denying the Bank's motions for a directed verdict and for judgment NOV. The Bank argues that the district court erred in interpreting *Toussaint* as holding that a plaintiff could have legitimate expectations grounded in written policy statements that do not specifically refer to termination for cause. However, the *Toussaint* court stated:

We hold that

. . . .

4) A jury could also find for Toussaint based on legitimate expectations grounded in his employer's written policy statements set forth in the manual of personnel policies.

*Id.* at 598–99, 292 N.W.2d at 885. The Bank argues that this statement must be read in light of what the Bank contends is the actual holding of *Toussaint*:

We hold only that an employer's express agreement to terminate only for cause, or statements of company policy and procedure *to that effect,* can give rise to rights enforceable in contract.

*Id.* at 610, 292 N.W.2d at 890 (emphasis added). Accordingly, the Bank contends that *Toussaint* only stands for the proposition that an employment contract will be terminable at will unless there is an express agreement "to terminate for cause" or express statements of company policy to that effect.

The Bank reads *Toussaint* too narrowly. Although the *Toussaint* court did hold that an express statement by an employer that an employee would retain his position as long as the employee performed adequately waived the employer's right to terminate the employee at will, the court recognized an alternative ground on which to base its decision. The court held that an employer statement of policy can create contractual rights in employees even though

the statement of policy is signed by neither party, can be unilaterally amended by the employer without notice to the employee, and contains no reference to a specific employee, his job description or compensation, and although no reference was made to the policy statement in pre-employment interviews and the employee does not learn of its existence until after his hiring.

*Id.* at 615, 292 N.W.2d at 892. Accordingly, the district court in denying the Bank's motions correctly followed the direction of the Michigan Supreme Court that "contractual obligations can be implicit in employer policies and practices." *Id.* at 617, 292 N.W.2d at 893.

Our decision that the district court did not err in construing *Toussaint* is supported by the interpretation of *Toussaint* that has been adopted by Michigan courts. In *Schipani v. Ford Motor Co.,* 102 Mich.App. 606, 302 N.W.2d 307 (1981), the court held that the plaintiff raised questions for the jury concerning the existence of an implied contractual right not to be terminated except for cause by introducing evidence of oral promises and statements in an employee manual even though the manual contained disclaimers and the employment contract included a provision that stated:

"I understand that my employment is not for any definite term, and may be terminated at any time, without advance notice by either myself or Ford Motor Company * * *."

The *Schipani* court held that even though the case was factually distinguishable from *Toussaint,* the trial judge acted properly in presenting the case to the jury because factual issues existed as to whether the oral promises or written statements in the employer's policy manuals made the employment contract not terminable at will. *Id.* at 612, 302 N.W.2d at 311.

The court in *Schwartz v. Michigan Sugar Co.,* 106 Mich.App. 471, 308 N.W.2d 459 (1981), provided an even clearer indication that *Toussaint* is not to be read narrowly so that only express agreements to terminate for cause or statements of company policy to that effect will make an employment contract not terminable at will. In *Schwartz* the court held that an employment contract terminable only for cause could be implied from the circumstances of employment. Although the court noted that "a mere subjective expectancy on the part of an employee will not create" contractual rights, *id.* at 478, 308 N.W.2d at 462, it held that

an employer's conduct and other pertinent circumstances may establish an unwritten "common law" providing the equivalent of a just cause termination policy. Rules and understandings, promulgated and fostered by the employer, may justify a legitimate claim to continued employment.

*Id.* at 477, 308 N.W.2d at 462. *Schwartz* clearly indicated that in the absence of an express agreement or an express statement in a policy manual that termination must be for cause an employment contract may exist that is not terminable at will. *Schwartz* stated that an employee could obtain a contractual right not to be terminated except for cause if such a right is reasonably

"to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction. *Miller v. Stevens* (1923), 224 Mich. 626 [195 N.W. 481]."

*Id.* at 477, 308 N.W.2d at 461 (quoting *Erickson v. Goodell Oil Co.,* 384 Mich. 207, 211–12, 180 N.W.2d 798, 800 (1970)). Accordingly, *Schwartz* affords more than adequate support for the district court's interpretation of *Toussaint,* an interpretation

which uniformly has been adopted by the district courts that have considered the issue. *See, e.g., Morris v. Chem-Lawn Corp.,* 541 F.Supp. 479, 481 (E.D.Mich.1982); *Marwil v. Baker,* 499 F.Supp. 560, 573 (E.D. Mich.1980).

■ The Bank also argues that Wiskotoni failed to produce sufficient evidence of either an express or an implied-in-fact contract that contains a term prohibiting discharge except for cause to raise a question for the jury. At trial, Wiskotoni introduced as evidence of such a contract a portion of an employee manual apparently distributed by the Bank to new employees. The manual included the following statement:

> You have been selected for a position because it was felt that you have the qualifications which in time will be of benefit both to you and to the Bank. Unless otherwise specified, you will be employed on a probationary basis for a period of three months. If it develops during that period that you are not pleased with your association or are not suited to the work of the Bank, your employment may be terminated, in mutual fairness, without any other reason.

Wiskotoni argued that this statement implied that employees who had completed their probationary period would not be discharged except for cause. Wiskotoni also testified that he understood that other employees were given valid reasons for termination by the Bank when they were discharged. Trans. at 36. Finally, Knibloe, president of the Bank, did not dispute the statement made by Wiskotoni's attorney during cross-examination that "it's your practice to dismiss for cause". Trans. at 97.

The district court did not err in finding that this evidence was sufficient to support the conclusion that a Bank employee had a legitimate expectation that employment would be terminated after the probationary period only for cause. The Bank's statement in its employee manual certainly supports an inference that upon completion of the probationary period an employee will not be discharged without cause. Considered by itself, Wiskotoni's testimony that

he had the understanding that employees were terminated only for cause by the Bank might best be viewed as merely an expression of the type of subjective expectancy that *Schwartz* held to be insufficient to vest contract rights. Read in conjunction with Knibloe's testimony, and in light of the statement of the employment manual, however, Wiskotoni's testimony justifies the finding that Bank employees had a legitimate expectation that upon completion of the probationary period they would not be terminated except for cause based not only on the policy statement contained in the employee manual but also on the basis of the Bank's conduct and practices. *See Greene v. Howard University,* 412 F.2d 1128, 1135 (D.C.Cir.1969) (provisions in faculty handbook incorporated in employment contracts of faculty). Accordingly, the evidence introduced by Wiskotoni "was sufficient to create a question of fact for the jury whether there was a mutual understanding that it was company policy not to discharge an employee [except for cause] and that this policy, expressed in documents . . . assertedly handed to [Wiskotoni] when he was hired, would apply to him as to other [Bank] employees." *Toussaint,* 408 Mich. at 613, 292 N.W.2d at 891. *See also Hrab v. Hayes-Albion Corp.,* 103 Mich.App. 90, 302 N.W.2d 606 (1981).

The Bank also contends that even if the evidence supports a finding that a contract was implied-in-fact, that contract at most can require that a reason be given upon the discharge, not that the discharge be for good or just cause. The Bank's contention is undercut by *Toussaint.* As the *Toussaint* court noted: "A promise to terminate employment for cause only would be illusory if the employer were permitted to be the sole judge and final arbiter of the propriety of the discharge." 408 Mich. at 621, 292 N.W.2d at 895. The district court's submission to the jury of the issue of whether Wiskotoni was discharged for cause was proper in light of *Toussaint. Id.* at 621–23, 292 N.W.2d at 896.

For the above reasons, the district court properly denied the Bank's motion for judg-

ment NOV with respect to the breach of contract claim.

IV. Status as National Bank

█ The Bank contends that because it is a national bank regulated by Section Fifth of the National Bank Act of 1864, 12 U.S.C. § 24 (Fifth), Michigan law does not govern its employment relations with Wiskotoni. Section Fifth of the National Bank Act provides:

Fifth. To elect or appoint directors, and by its board of directors, to appoint a president, vice president, cashier, and other officers, define their duties, require bonds of them and fix the penalty thereof, dismiss such officers or any of them at pleasure, and appoint others to fill their places.

As the Bank noted, § 24 (Fifth) has consistently been construed by both federal and state courts as preempting state law governing employment relations between a national bank and its officers and depriving a national bank of the power to employ its officers other than at pleasure. *See, e.g., Bollow v. Federal Reserve Bank of San Francisco,* 650 F.2d 1093, 1097 n. 3 (9th Cir.1981) (dictum); *Westervelt v. Mohrenstecher,* 76 F. 118, 121 (8th Cir.1896); *Kemper v. First National Bank in Newton,* 94 Ill.App.3d 169, 49 Ill.Dec. 799, 418 N.E.2d 819 (1981).

The continuing vitality of the rule encapsulated in § 24 (Fifth) is not dispositive, however, and does not require holding the Bank immune from liability under state law if as Wiskotoni contends, and the district court found, Wiskotoni was not an officer to whom the rule applied. The question of whether a branch manager is an officer to whom § 24 (Fifth) applies has not been resolved by the courts.

In support of its contention that Wiskotoni as a branch manager was an officer of the Bank for the purposes of § 24 (Fifth), the Bank notes that § 4.5 of its By-Laws provides:

*Other officers.* The board of directors may appoint one or more assistant vice presidents, one or more trust officers, one or more assistant secretaries, one or more

assistant cashiers, one or more managers and assistant managers of branches and such other officers and attorneys in fact as from time to time may be required or desirable to transact the business of the association. Such officers shall respectively exercise such powers and perform such duties as pertain to their several offices, or as may be conferred upon, or assigned to, them by the board of directors, the chairperson of the board, or the president.

The Bank argues that its characterization of branch managers as officers in the By-Laws should be dispositive. We do not agree.

In determining the scope of the statute, the realities of the situation must be considered. The terms of § 24 (Fifth) requires that officers be appointed and dismissed by a national bank's board of directors. Wiskotoni was neither appointed nor dismissed by the Bank's board. Wiskotoni was hired by Johnson, who was at that time president of the Bank. The decision to terminate Wiskotoni was made by Knibloe, successor president of the Bank. Wiskotoni was informed of his discharge by Knibloe and Osorno, Bank vice-president. Although there is some evidence that Knibloe discussed Wiskotoni's termination with several members of the Bank's board of directors, the board took no official action until June 23, 1981, when on the eve of oral argument on this issue before the district court, it passed a resolution purportedly ratifying Wiskotoni's dismissal. The district court properly rejected the Bank's argument that this belated attempt to ratify Wiskotoni's termination which had occurred more than three years before satisfied the statutory requirements that officers of a national bank be dismissed by an action of the bank's board of directors, particularly in light of the evidence that the normal practice of the Bank was for the president, and not the board of directors, to appoint and terminate branch managers. For these reasons, the district court properly held that Wiskotoni was not an officer of the Bank for the purposes of the National Bank Act.

## V. Damages

With respect to the jury's award of damages, the Bank contends that the award for lost past wages was excessive and unsupported by the evidence, that under Michigan law damages for mental anguish are not permitted in this type of case, and that there is no evidence to support the award of damages for mental anguish and loss of professional reputation.

As a preliminary point, we note that the Bank has mischaracterized the jury's verdict. The Bank contends that the jury's verdict established damages as follows:

| | |
|---|---:|
| Loss of wages to date | $29,500 |
| Loss of future wages | 0 |
| Mental Anguish | 25,000 |
| Loss of professional reputation | 10,000 |
| Cost of Moving Expenses | 600 |

In fact, the jury's verdict and the judgment on damages was as follows:

| | | |
|---|---:|---:|
| Past lost wages | $29,332 | |
| Future lost wages | 0 | |
| Total wage damages | | $29,332 |
| Loss of professional reputation | $25,000 | |
| Mental Anguish | 10,000 | |
| Moving expenses | 600 | |
| Total other damages | | $35,600 |
| Total damages | | $64,932 |

### A. Loss of Wages

On appeal the Bank presents the same argument concerning the award of lost wages that it presented to the district court in support of its motion for a remittitur. We believe that that portion of Chief District Judge Wendell Miles's opinion which deals with the argument clearly demonstrates that the jury's award is not excessive. We append the relevant portion of Chief Judge Miles's opinion to our opinion.

### B. Mental Anguish

The Bank raises several issues with respect to the award of damages for mental anguish. The Bank first argues that because the jury found that the discharge was in violation of Wiskotoni's employment contract, Wiskotoni's recovery of damages

should be limited to the economic value of the contract. The Bank relies on *Isagholian v. Carnegie Institute of Detroit, Inc.,* 51 Mich.App. 220, 214 N.W.2d 864 (1974), for the proposition that damages for mental anguish are not recoverable where the contract breached is commercial in nature as is the case where an employment contract is breached.

The Bank's reliance on *Isagholian* is misplaced. While it is true that damages for a breach of a commercial contract are generally limited to the monetary value of the contract, the award of damages is not so limited where the same state of facts that establish a breach of contract also establish a cause of action in tort. *Kewin v. Massachusetts Mutual Life Insurance Co.,* 409 Mich. 401, 415 & n. 1, 295 N.W.2d 50, 53 & n. 1 (1980). Because wrongful discharge in violation of public policy states an action in tort rather than contract, damages are not limited by contract principles. *See, e.g., Harless v. First National Bank,* 289 S.E.2d 692, 699–700 (W.Va.1982); *Smith v. Atlas Off-Shore Boat Service, Inc.,* 653 F.2d 1057, 1064 (5th Cir.1981).

The Bank next argues that even under tort principles damages for mental anguish are not recoverable because they are exemplary damages that are recoverable only for an "injury maliciously and wantonly inflicted." *Ray v. City of Detroit,* 67 Mich.App. 702, 704, 242 N.W.2d 494, 495 (1976). The Bank, relying on *Bailey v. Graves,* 411 Mich. 510, 309 N.W.2d 166 (1979), contends that because the trial judge did not instruct the jury that exemplary damages are recoverable only if the tort was committed maliciously, wantonly or with reckless disregard for the rights of others, the award of damages for mental anguish must be vacated.

The Bank's argument is without merit. First, unlike the defendant in *Bailey,* the Bank neither objected to the jury instructions on the ground that they inaccurately stated the law nor submitted alternative instructions.[5] Accordingly, the Bank

---

**5.** The Bank did object to submission of the

issue of damages for mental anguish on the

may not argue that the instructions were erroneous on appeal. *Batesole,* 505 F.2d at 804. Second, and more importantly, the Bank misconstrues the law of damages for mental anguish in Michigan. In a recent case, *Veselenak v. Smith,* 414 Mich. 567, 327 N.W.2d 261 (1982), the Supreme Court of Michigan, after noting that early cases had construed the concept of exemplary damages to permit a recovery for mental injury that was not otherwise recognized, held that "actual damages now include compensation for mental distress and anguish." *Id.* at 574, 327 N.W.2d at 264. *See Grenawalt v. Nyhuis,* 335 Mich. 76, 55 N.W.2d 736 (1952); *Ross v. Leggett,* 61 Mich. 445, 28 N.W. 695 (1886); Restatement, Torts 2d § 905 (1977). The court in *Veselenak* made clear, however, that exemplary damages for injury to feelings may not be recovered in addition to ordinary damages for mental distress and anguish in a tort case. 414 Mich. at 572, 327 N.W.2d at 263. Because the trial judge instructed the jury concerning ordinary damages and not exemplary damages for mental anguish, the instructions were not erroneous.

The Bank's final argument is that the jury's award of damages for mental anguish is unsupported by the evidence. The Bank premises its argument on Wiskotoni's failure to offer evidence that he sought medical, psychiatric or psychological treatment. The Bank contends that such evidence is necessary for the jury's verdict not to be merely speculative.

█ The premise of the Bank's argument is erroneous. In *Birkhill v. Todd,* 20 Mich.App. 356, 365–66, 174 N.W.2d 56, 60–61 (1969), the court held that a plaintiff's testimony might be sufficient to support recovery of damages for mental anguish and distress. Accordingly, medical evidence is not required to demonstrate mental anguish sufficient to permit the recovery of exemplary damages.

█ The Bank's conclusion that the jury's verdict is not supported by the evidence, however, is correct. In assessing the evidence introduced by Wiskotoni in support of his claim for damages for mental anguish, the district court in its opinion on the Bank's motion for judgment NOV stated:

> [A]s to mental anguish, the jury could infer such damage from the plaintiff's testimony as to his unsuccessful job searches and reduction in status. Plaintiff picked apples and worked as a bartender to support his family before he became a baker's helper. Plaintiff testified that he moved from Kalamazoo to South Bend to make a new start in life, and protect his children from adverse publicity (Tr. 10).

Appendix at 184. The only other evidence supporting a finding of mental anguish is Wiskotoni's testimony that he was not working in banking because he "just got a funny feeling that nobody wants me . . . ." Trans. at 12.

This evidence is insufficient as a matter of law to support an award of damages for mental anguish. Wiskotoni, who had the burden of proof with respect to demonstrating damages for mental anguish, failed to provide specific and definite evidence of his own mental anguish, anxiety or distress. Our conclusion is consistent with the decisions of the Michigan courts. In *Vachon v. Todorovich,* 356 Mich. 182, 188, 97 N.W.2d 122, 126 (1959), the court when faced with a claim for extreme shock and fright stated:

> [The plaintiff], carrying the burden of proof of damages as alleged by her, offered no proof in support of the above allegations other than her own testimony that "to a certain extent I have been nervous and this here aggravated it more;" also that she gets "that feeling" she didn't have before the accident, resulting in "those crying spells." Her testimony was vague and uncertain, and it gave the jury little or nothing into which its members could set their damage-assessment teeth.

The evidence offered by Wiskotoni is even more vague and uncertain than that presented by the plaintiff in *Vachon* because here there is no direct evidence that Wiskotoni underwent any mental suffering award of such damages.

beyond Wiskotoni's testimony that he had "a funny feeling". Accordingly, we vacate the award of damages for mental anguish.

### C. Loss of Professional Reputation

■ The Bank also argues that the award of damages for loss of professional reputation is unsupported by the evidence. The Bank states that it did nothing to communicate the fact of or the reasons for Wiskotoni's dismissal to anyone. The Bank then argues that because Wiskotoni himself informed prospective employers of his discharge, and the circumstances thereof, Wiskotoni is barred from recovering for injury to his professional reputation.

As in the case of the award for mental anguish, Wiskotoni had the burden of demonstrating an injury by a preponderance of the evidence. *See Vachon, supra.* We believe that the district court did not err in finding that Wiskotoni met this burden.

Substantial evidence supports the jury's award of damages for loss of reputation. First, at the time of trial, Wiskotoni was not employed in the banking field, but rather was employed as a baker's helper. The prestige and future prospects of this position are not comparable to those that Wiskotoni enjoyed prior to his discharge.

Second, although, as the Bank noted, Wiskotoni informed potential employers of the circumstances of his discharge, the reason for this communication was that potential employers always inquired as to the reasons for his discharge from the Bank. Moreover, this case is not based on a theory of libel or slander in which injury results only from the tortfeasor's publication of the defamatory statements. Instead, the theory of this case is that of a tortious discharge from employment in violation of public policy. In such an instance, the tortfeasor is liable for the damages resulting from the discharge, even if those damages are not physical in nature. We additionally observe that here the Bank simply ignores the testimony of Knibloe that on at least one occasion he, or another officer of the Bank, discussed Wiskotoni's termination with potential employers of Wiskotoni. Trans. at 96.

Third, Wiskotoni produced evidence that while he had been able to obtain employment in the banking field within one month of a previous termination of employment, he had been unable to find such employment in the better than two years that had elapsed between his termination by the Bank and the trial. The jury was entitled to infer from this difficulty in obtaining reemployment in his chosen field, as well as from the rest of the evidence, that the Bank's discharge had injured his professional reputation.

Having determined that the jury could properly find that damages could be awarded for the injury to Wiskotoni's professional reputation, we further conclude that the jury's award of $25,000 to compensate him for that injury was not excessive. *See Sias v. General Motors Corp.,* 372 Mich. 542, 127 N.W.2d 357 (1964) (upholding jury award of $24,800 general damages for injury to reputation as not excessive in slander action against former employer); *Oppenhuizen v. Wennersten,* 2 Mich.App. 288, 139 N.W.2d 765 (1966) (upholding award of exemplary damages for injury to reputation and mental anguish). Consequently, we affirm the district court's judgment on the award for loss of professional reputation.

### VI. Conclusion

In summary, we hold that the district court erred only in submitting the issue of damages for mental anguish to the jury. Accordingly, the cause is remanded to the district court with instructions to modify the judgment, which is otherwise affirmed, by excluding the amount awarded by the jury for mental anguish.

### APPENDIX "A"

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| | No. K 78–638 CA 4 |
| RAYMOND R. WISKOTONI, | OPINION ON DEFEN- |
| *Plaintiff,* | DANT'S MOTION JNOV |
| | OR REMITTITUR (EX- |
| vs. | CERPT) |
| | |
| MICHIGAN NATIONAL BANK-WEST, | October 22, 1981 |
| *Defendant.* | Judge Wendell A. |
| | Miles |

Finally, defendant argues that the award of damages for past lost wages in the amount of $29,332 is excessive and unsupported by the evidence. Defendant asserts that plaintiff's income tax returns for the years 1978, 1979, and 1980 reveal earnings of $32,698. Defendant asserts that plaintiff during the same period would have made, if not discharged, only $15,800 per year, or $47,400 for the three year period, plus raises of $1,500, for a total of $48,900. Under this theory, plaintiff's maximum lost wages would be the difference between $48,900 and $32,698, or $16,202. Because the jury awarded $29,332 instead of $16,202, defendant argues that the verdict is excessive by the difference, $13,130.

Defendant overlooks much evidence that the jury obviously did not. The Court cannot determine precisely what inferences were made, and income figures used, by the jury. The Court can, however, determine what inferences and income figures the jury would be justified in using, and compare a figure so reached with the jury's verdict.

First, Exhibit 9, the stipulated affidavit of Peter Knibloe, reveals that plaintiff was making $15,700 in 1977, and that the next highest paid branch manager was paid $15,000. The jury could infer that, had he not been discharged, plaintiff would have continued to be the highest paid branch manager. The jury could also infer that plaintiff's wages would exceed the next highest paid branch manager's wages by about the same percentage as in 1977, about 4.7%. Such an inference would put plaintiff's wages not at the top of the subsequent salary ranges revealed in Exhibit 9, but rather 4.7% above them.

Second, defendant neglects to consider the Employee Stock Bonus Plan, revealed in Exhibit 7 and in testimony (Tr. 14–15), which would increase plaintiff's compensation by seven percent of his wages. According to Exhibit 9, the stock bonus plan has been paid every year since its inception.

Third, defendant's figures for plaintiff's actual wages during 1978, 1979, and 1980 include a number of items not properly categorized as plaintiff's wages for purposes of mitigation of lost wages. These are plaintiff's income from wages and stock bonus in defendant's employ during the first two months of 1978, interest income in 1978 and 1979, and income of Mary Wiskotoni in 1978 and 1979.

Fourth, to the Court's surprise, a review of the Transcript and exhibits reveals that there is no direct evidence of plaintiff's earnings in the first eights [sic] months of 1981. The jury could have inferred that plaintiff would have made about the same income as in 1980, but the jury was not obligated to do so. To the extent that this is a deficiency in the record, it is attributable to defendant's failure to bring out this evidence of mitigation of damages. Through three cross examinations, defendant never asked plaintiff how much he had made from the beginning of 1981 until the date of the trial. The Court cannot reduce the verdict on the basis of what defendant should have, but did not, put in evidence.

Had the jury made these justifiable inferences from the evidence in this case, they would have been justified in calculating a verdict as follows:

LOST WAGES:

| 3/1/78–7/1/78 (four months) | | |
|---|---|---|
| (4/12) x $15,700 | $5233.33 | (sic) |
| plus stock bonus 7% | 366.33 | |
| | | $5,599.66 |
| 7/1/78–12/1/79 (seventeen months) | | |
| (17/12) x (1.047) x $16,000 | $23,732.00 | |
| plus stock bonus at 7% | 1,661.24 | |
| | | $25,393.24 |
| 12/1/79–12/1/80 (twelve months) | | |
| (12/12) x (1.047) x $17,500 | $18,322.50 | |
| plus stock bonus at 7% | 1,282.58 | |
| | | $19,605.08 |
| 12/1/80–9/1/81 (nine months) | | |
| (9/12) x (1.047) x $17,899 | $14,055.19 | |
| plus stock bonus at 7% | 983.86 | |
| | | $15,039.05 |
| TOTAL LOST WAGES | | $65,637.03 |

MITIGATION EARNINGS:

| 1978 Total Income (Ex. 3) | | $5,796.00 |
|---|---|---|
| less MNB-W wages | $3600.00 | (sic) |
| less MNB-W stock | | |
| bonus | 275.00 | |

MITIGATION EARNINGS:—Continued

| | | |
|---|---|---|
| less Mary Wiskotoni | 241.82 | |
| less interest income | 144.00 | |
| | | (4,260.82) |
| | | $1,535.18 |
| 1979 Total Income (Ex. 5) | $12,186.00 | |
| less Mary Wiskotoni | 947.39 | |
| less interest income | 13.24 | |
| | | (960.63) |
| | | $11,225.37 |
| 1980 Total Income (Ex. 6) | | $15,387.00 |
| 1981 Total Income—None proven | | 0.00 |
| TOTAL MITIGATION EARNINGS | | $28,147.55 |

The difference, $65,637.03 less $28,147.55, represents damages the jury could justifiably have found for past lost wages in the amount of $37,489.48. Even accounting for discounting wages after the date of the filing of the complaint to that date, September 13, 1978, the jury's verdict of $29,-332.00 for past lost wages was well within the jury's competence based on the evidence at trial. The Court declines to disturb it.

WELLFORD, Circuit Judge, dissenting.

I respectfully dissent from the majority's affirmance of the district court judgment. I believe that the trial court erred, under the facts of this case, in holding that the termination in controversy was a violation of public policy. In addition, I would find the evidence insufficient for a finding of implied contract that plaintiff might be discharged only for good cause. Finally, I would find Wiskotoni to be an "officer" within the meaning of the National Bank Act, and that the defendant Bank was therefore empowered to dismiss him "at pleasure."

The majority characterizes defendant Bank's argument regarding public policy as merely a challenge to the jury instructions, to which it finds there was inadequate objection. The majority therefore concludes that the standard of review on this issue is whether the jury instructions were "clearly erroneous." The Bank's brief before this court, however, attacks the trial court's holding, in denying it summary judgment, that termination of Wiskotoni's employment for being subpoenaed before the grand jury investigating his conduct was a violation of public policy as a matter of law. While the trial court incorporated this holding into jury instructions, the challenge involved is directed primarily to the legal holding, not to the jury instructions. We are called upon to review the trial court's conclusion of law, and thus the standard of review should not be whether such a holding is "clearly erroneous."

Michigan courts have not been inclined to hold discharges of at-will employees to be in contravention of public policy. The trial court acknowledged that "[a]ppellate courts have approached the new doctrine on tiptoes, declining to apply it in ... situations where no clear mandate of public policy is involved." Citing Sventko v. Kroger Co., 69 Mich.App. 644, 651, 245 N.W.2d 151, 155 (1976) (Allen, J., concurring). The Michigan Supreme Court reviewed Michigan law regarding the public policy exception in Suchodolski v. Michigan Consolidated Gas Co., 412 Mich. 692, 316 N.W.2d 710, 711 (1982). In its discussion of the public policy exception, the Suchodolski court stated:

> Most often these proscriptions are found in explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty.
>
> The courts have occasionally found sufficient legislative expression of policy to imply a cause of action for wrongful termination even in the absence of an explicit prohibition on retaliatory discharges. Such a cause of action has been found to be implied where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment
>
> . . . .
>
> In addition, the courts have found implied a prohibition on retaliatory discharges when the reason for a discharge was the employee's exercise of a right conferred by a well-established legislative enactment.

316 N.W.2d at 711–12 (citations omitted). In support of its conclusion, the majority cites the Michigan laws establishing the grand jury system and penalizing witnesses'

failure to appear which were not relied upon by the trial court. This case clearly does not involve a "refusal to violate a law in the course of employment" or "the employee's exercise of a right conferred by a well-established legislative enactment." *Suchodolski,* 316 N.W.2d at 711–12. Wiskotoni did not allege that the appellant Bank intended by its actions to coerce him so that he would *not* appear before the grand jury; his argument, rather, is that the termination was somehow "punishment" for being subpoenaed in connection with an investigation involving his own alleged misconduct.

The Michigan decisions holding that a particular discharge was in violation of public policy fall clearly within the three categories enumerated in *Suchodolski, supra.* In *Schwartz v. Michigan Sugar Co.,* 106 Mich.App. 471, 308 N.W.2d 459 (1981), the discharge was allegedly because the plaintiff, as safety director of the defendant corporation, rigorously enforced the Michigan Occupational Safety and Health Act. A Michigan statute expressly prohibited the discharge of an employee because he files a complaint, institutes a proceeding under the Act, testifies in a proceeding, or exercises a right afforded by the Act. Thus, there was an "explicit legislative statement [ ] prohibiting the discharge." The court found under this statute that the termination violated public policy.

A discharge for "refusal to violate a law in the course of employment" was addressed in *Trombetta v. Detroit T & I R. Co.,* 81 Mich.App. 489, 495, 265 N.W.2d 385 (1978). In *Trombetta,* the appellate court reversed a summary judgment for the defendant, holding that the plaintiff's claim that he was discharged for failure to manipulate sampling results used to file pollution control reports as required by state statute stated a cause of action. Finally, in *Sventko v. Kroger Co.,* 69 Mich.App. 644, 245 N.W.2d 151 (1976), the court dealt with the discharge of an employee because of "the employee's exercise of a right conferred by a well-established legislative enactment." In *Sventko,* the plaintiff was discharged because he filed a workman's compensation claim. The court found that this violated Michigan public policy. *See also Clifford v. Cactus Drilling Corp.,* 109 Mich.App. 776, 312 N.W.2d 380, 381 (1981). Thus, each of these decisions falls clearly within the categories enumerated in *Suchodolski.*

Other decisions concluding that a questioned termination did *not* violate Michigan public policy are also instructive. In *Percival v. G.M.C.,* 400 F.Supp. 1322, 1323–24 (E.D.Mo.1975), a Missouri federal district court applying Michigan law found that the plaintiff's discharge, allegedly due to his attempts to correct misleading information given out by GM and conveyed to stockholders and the general public, did not fall within the exception because no clear mandate of public policy was violated. In *Suchodolski, supra,* the plaintiff employee had attempted to report and correct questionable internal accounting procedures of the defendant public utility. The court held that his termination was not a violation of Michigan public policy, in spite of Michigan's extensive regulation of the accounting practices of public utilities.

The facts in the case at bar simply do not fall within any of the classifications recognized in *Suchodolski.* There was certainly no "explicit legislative statement [ ] prohibiting the discharge." The termination was neither in retaliation for Wiskotoni's "refusal to violate a law in the course of employment" nor for Wiskotoni's exercise of a right conferred by statute, since the Bank clearly did not seek to prevent Wiskotoni from testifying before the grand jury, nor did it seek in any way to have him violate any law. In the face of the Michigan courts' admonition that the public policy exception is to be used sparingly, the majority's creative extension of Michigan law in this instance is unjustified. *See Schipani v. Ford Motor Co.,* 102 Mich.App. 606, 620, 302 N.W.2d 307 (1981); *Sventko, supra,* 69 Mich.App. at 651, 245 N.W.2d at 155.

The reason for the grand jury investigation in this case, moreover, should not be ignored. Wiskotoni received a grand jury subpoena because it was suspected that he was involved in a numbers racket. He was

not simply subpoenaed to testify as a witness with pertinent information: he was a supposed *target* of the investigation, which might well be embarrassing to the Bank as his employer. It was therefore error for the trial court to rule that "as a matter of law, termination of employment for being subpoenaed before a grand jury ... is a violation of public policy," particularly under such circumstances.

Was the evidence presented at trial sufficient to support a finding that an implied contract existed between Wiskotoni and the Bank, and that a term of the implied contract was that Wiskotoni would be discharged only for cause? The evidence cited by the majority in support of its conclusion consists of (a) a single statement in the Bank employee manual that an employee may be terminated during his probationary period if he is not suited to the work of the Bank, without any other reason, (b) testimony by Wiskotoni that he "understood" that other employees were given valid reasons for their termination, and (c) the fact that the president of the Bank "did not dispute" a statement by Wiskotoni's attorney that it was the Bank's practice to dismiss for cause. I would find this evidence insufficient as a matter of law.

The primary decision relied upon by my brethren is *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980). *Toussaint,* as the majority states, establishes the principle under Michigan law that employer statements of policy in employee manuals can under certain circumstances give rise to implied employee contractual rights. 292 N.W.2d at 890, 892. The majority opinion fails to discuss, however, the evidence relied upon in *Toussaint* to support a finding of contractual rights. *Toussaint* testified that when he was hired he inquired about job security and was told that "as long as I did my job I would be with the company." In addition, the manual of company policies given to Toussaint stated expressly that "it was the 'policy' of the company to release employees 'for just cause only.'" 292 N.W.2d at 884 n. 5. Accordingly, it was held appropriate for the jury to find that Toussaint had legiti-

mate expectations grounded in his employer's written policy statements set forth in the manual of policies buttressed by alleged oral representations as well. 292 N.W.2d at 885. These factual circumstances are vastly different from those in the instant case.

The majority also relies upon *Schwartz v. Michigan Sugar Co.,* 106 Mich.App. 471, 308 N.W.2d 459 (1981). In *Schwartz* the court found the evidence clearly insufficient to establish anything more than plaintiff's subjective expectancy regarding his employment. There were found no objective manifestations in *Schwartz* of any agreement by the employer to limit its right of discharge to "just cause" situations. Further, that court held that a "terminable at will discharge" need not necessarily be made in good faith. 308 N.W.2d at 463. The *Schwartz* decision, although it cites *Toussaint,* seems to support the Bank's position not only on the implied contract claim but also on the "public policy" claim advanced by plaintiff.

The majority cites two other cases in support of its conclusion, *Morris v. Chem-Lawn Corp.,* 541 F.Supp. 479 (E.D.Mich. 1982) and *Marwil v. Baker,* 499 F.Supp. 560 (E.D.Mich.1980). In *Morris,* the district court found that the plaintiff had raised an issue of material fact regarding the existence of an agreement to terminate her employment only for cause, citing *Toussaint, supra.* As in *Toussaint,* the plaintiff testified that she was told expressly that "she would have a job at Chem-Lawn as long as she carried out her duties as a secretary." 541 F.Supp. at 481. There is no such representation asserted by Wiskotoni in the instant case.

In *Marwil,* the district court restated the *Toussaint* principle that

[i]n Michigan an employee can have contractual rights in the procedures and benefits found in statements of policy. *See Toussaint* .... The Court in *Toussaint* explained that those contractual obligations can be implicit in the policies and practices of the employer.

499 F.Supp. at 573. The court then examined the evidence proffered by the plaintiff. Plaintiff Marwil, a university professor whose contract was not renewed, argued that his contract with the University guaranteed a tenure review in his sixth year and a seventh terminal year. Regarding the seventh terminal year, the plaintiff cited statements of policy providing for a one-year terminal appointment when an assistant professor is not recommended for tenure at the end of the sixth year. The court found that this policy statement did *not* turn a six-year contract into a seven-year contract. 499 F.Supp. at 574. The court finally declined to enforce contractual obligations "based on a custom which at best finds only tenuous support in the facts." 499 F.Supp. at 576.[1]

That portion of the Bank's employee manual relied upon by plaintiff states:

> Unless otherwise specified, you will be employed on a probationary basis for a period of three months. *If it develops during that period that you* are not pleased with your association or *are not suited to the work of the Bank, your employment may be terminated, in mutual fairness, without any other reason.*

(Emphasis added.) Wiskotoni argued and the majority accepted a negative inference from this statement, that if during the probationary period an employee could be terminated for no reason, after the probationary period an employee could be terminated *only* for cause. I cannot agree that this statement "certainly" supports the inference argued by the plaintiff. *See Marwil, supra,* at 574–75.

In any event, the negative inference argued from this statement falls far short of the evidence relied upon in *Toussaint, su-*

pra, in which the employee manual stated expressly that it was the "policy" of the company to terminate employees "for just cause only." *Toussaint, supra,* 292 N.W.2d at 884 & n. 5.

The only evidence of the Bank's alleged "custom" of termination only for just cause is Wiskotoni's testimony in that regard. An examination of that testimony[2] reveals only Wiskotoni's self-serving statement in response to leading questions that he "presumed" that unspecified "other employees" were terminated for good cause. No testimony of such former employees was offered, and he did not even state that they told him the reasons given for their terminations. That evidence, in my view, is inadequate to indicate there was any Bank practice as argued by plaintiff's counsel.

The majority finally states that "Knibloe, president of the Bank, did not dispute the statement made by Wiskotoni's attorney during cross-examination that 'it's your practice to dismiss for cause.'" That actual testimony is set out in the record:

Q: I gathered it's your practice to dismiss for cause? You said the assistant vice president was let go because of the forgery matter. You said he was dismissed for cause, is that correct?

A: Yes, but that was not the reason he was dismissed. The forgery matter and the fraudulent loans turned up after he was dismissed, because he could no longer make himself loans to cover those previous loans. He was dismissed for other reasons.

Transcript at 97. Knibloe merely answered the second, more specific question asked by

---

1. The majority also cites *Hrab v. Hayes-Albion Corp.,* 103 Mich.App. 90, 302 N.W.2d 606 (1981). The court there found that the plaintiff had presented sufficient evidence to find that his contract was terminable only for cause, but did not elaborate on the evidence presented.

2. Wiskotoni testified on redirect:
   Q: From your work experience in Michigan National Bank, were other employees given valid reasons for termination?
   A: I presumed so.

Q: Was it your understanding from the policy book and from your experience, that employees could just be let go at the will of the bank?
A: No. That was not my understanding.
Q: And it was your understanding when they say reason, it meant a good reason in that policy book?
A: Yes.
Transcript at 36.

Wiskotoni's attorney. I cannot glean from this question and answer that the Bank "did not dispute" Wiskotoni's unsupported allegation.

In sum, the evidence relied upon by the majority appears to be "slender reeds on which to build a contractual term." *Marwil v. Baker, supra,* 499 F.Supp. at 575. I find this evidence entirely insufficient to support a finding of an implied contractual agreement to terminate employment only for good cause.[3]

Finally, the majority holds that Wiskotoni, as a branch manager, was not an "officer" within the meaning of the National Bank Act, 12 U.S.C. § 24, and that therefore the Bank may not assert the Act as a defense to the implied contract.

The Bank's by-laws expressly name branch managers as officers of the Bank; Wiskotoni was a branch manager. Wiskotoni was hired and fired by the president of the Bank, but this authority was "*delegated to the Bank's president, who generally counsels with other officers and/or directors of the bank in the exercise of those duties.*" App. at 96 (testimony of the Bank's senior vice president). In addition, section 4.2 of the Bank's by-laws, pertaining to the Bank president, provides:

> The President shall also have and may exercise such further powers and duties as from time to time may be conferred, or assigned by the Board of Directors.

App. at 87. The Bank's Board acted through the Bank president in hiring and firing Wiskotoni; Wiskotoni should be deemed an "officer" within the meaning of the Act; he occupied a position of responsibility and discretion.

For all these reasons, I would reverse the judgment of the district court and remand with orders to dismiss appellee Wiskotoni's cause of action.

Since I would find that Wiskotoni is not entitled to any damages, I make only a brief reference to this aspect of the case. An award for mental anguish is improper in

a case for wrongful discharge. The Michigan cases relied upon to justify any such element involve torts that resulted in physical trauma or damage accompanied by mental anguish. *See, e.g., Veselenak v. Smith,* 414 Mich. 567, 327 N.W.2d 261 (1982); *Birkhill v. Todd,* 20 Mich.App. 356, 174 N.W.2d 56 (1969); *Grenawalt v. Nyhuis,* 335 Mich. 76, 55 N.W.2d 736 (1952). I would doubt furthermore that an award for loss of professional reputation (due more likely to the grand jury investigation than from discharge) would be appropriate in a case of this kind. *See Sias v. General Motors Corp.,* 372 Mich. 542, 127 N.W.2d 357 (1964).

Accordingly, I would reverse the judgment entered in this case for plaintiff-appellee for all the reasons indicated, or remand, in the alternative, for a proper determination of damages.

---

3. I must note, however, that it is difficult for me to see how Wiskotoni's being subpoenaed to appear before a grand jury investigating his involvement in a numbers racket does not constitute "good cause" for his discharge as a bank official.