723 P.2d 858

**Raymond A. ALEGRIA,**
**Plaintiff-Appellant,**

**v.**

**IDAHO FIRST NATIONAL BANK,**
**Defendant-Respondent.**

**No. 16129.**

Supreme Court of Idaho.

July 15, 1986.

Richard B. Eismann, Caldwell, for plaintiff-appellant.

John C. Ward, argued, and Debra K. Ellers, Boise, for defendant-respondent.

SHEPARD, Justice.

This is an appeal from a summary judgment dismissing plaintiff's action for breach of employment contract on the basis that the cause of action is preempted by federal statute. We affirm.

Idaho First National Bank, is a national banking association with its principal place of business in Boise, and has 72 branch locations in Idaho. Alegria worked for the bank for 17 years in various positions, and in 1974 the board of directors of the bank

appointed him assistant manager of the Homedale branch. In 1978 the board of directors appointed Alegria assistant manager of the Eagle branch. Brown was the manager of the Eagle branch. During 1979, managerial performance at the Eagle branch came into question since profitability had apparently declined and customer dissatisfaction had surfaced. Ultimately, in May 1982 both Brown and Alegria were fired.

Both Brown and Alegria brought actions against the bank alleging breach of their employment contracts, and their cases were consolidated for discovery and trial. Upon motion therefor, summary judgment was granted in favor of the bank, and against both plaintiffs, wherein the court found as a matter of law that 12 U.S.C. § 24 (1982) precluded plaintiffs' claims. That statute provides in pertinent part that a national bank has the power:

> "FIFTH. To elect or appoint directors, *and by its board of directors* to appoint a president, vice president, cashier, *and other officers*, define their duties, require bonds of them and fix the penalty thereof, *dismiss such officers or any of them at pleasure*, and appoint others to fill their places." (Emphasis added.)

The district court held as a matter of law that the term "other officers" includes managers and assistant managers of national bank branches. Brown did not appeal from that summary judgment, but Alegria appeals, asserting as a matter of law that an assistant branch manager does not fall within the term "other officers" and argues alternatively that such is a factual question to be determined at trial. We disagree.

In 1983 two decisions of federal courts addressed the same issue presented here under circumstances similar to the case at bar. *Wiskotoni v. Michigan Nat. Bank-West,* 716 F.2d 378 (6th Cir.1983); *Mahoney v. Crocker National Bank,* 571 F.Supp. 287 (N.D.Cal.1983). In *Wiskotoni* it was conceded that the manager of a national banking association fell within the term "other officers" of 12 U.S.C. § 24

(1982). But since he was neither appointed nor dismissed by the bank's board of directors, but rather hired and fired by the bank president, the statutory requirement was not met and the federal legislation did not bar that plaintiff's claim for breach of implied contract and wrongful discharge.

Similarly, in *Mahoney*, a manager and assistant manager of a branch of a national banking association brought state law claims against the bank for alleged acts of discrimination, and the bank interposed 12 U.S.C. § 24 (1982) as a defense to the state law claims. There plaintiffs argued, as does plaintiff in the instant case, that the phrase "other officers," as used in the federal legislation, applies only to senior officers and not to lower echelon officers such as branch managers and assistant branch managers. The court, however, based its ruling on the assumption that branch managers and assistant branch managers were included in the phrase "other officers" but that nevertheless while the plaintiffs were hired by the board of directors in accordance with the federal legislation, they were not dismissed by said board of directors, and hence there was no Congressional authorization for the dismissals at pleasure. *See also McWhorter v. First Interstate Bank,* 67 Or.App. 435, 678 P.2d 766 (1984), wherein that court relied on *Wiskotoni, supra,* and stated, "Although we are not bound by lower federal court decisions, we give due regard to federal courts of appeal decisions on matters of federal law." (Citations omitted.)

In the instant case, clearly Alegria was appointed assistant branch manager at the Eagle branch by resolution of the bank board of directors. Alegria argues that he was not terminated by the board of directors, but rather by the then branch supervisor late in the day, Friday, May 21, 1982. Alegria asserts that he and Brown were offered the option of resigning or being terminated, but that neither of them signed resignation letters. The record indicates that on the previous day, May 20, 1982, the bank's board of directors took

action regarding Alegria's separation from employment, stating:

> "BE IT RESOLVED, That the resignation of Raymond A. Alegria, Assistant Branch Manager II of the Eagle Valley Office, be accepted and *his authority to transact business for the bank be revoked effective May 21, 1982.*" (Emphasis added.)

The record further indicates that the board of directors was aware that both Brown and Alegria would be given the option to resign or be fired. We deem the distinction between a "dismissal" and the face-saving device of a "resignation which if not immediately tendered will be followed by dismissal," is a distinction without a difference. Clearly, the board of directors intended to dismiss and terminate Alegria and revoke his authority to transact business for the bank, effective on the following day.

Alegria asserts that the words "other officers" contained in 12 U.S.C. § 24 (1982), under the doctrine of *ejusdem generis*, must be construed to include only those "other officers" as perform duties similar to the offices of president, vice president, and cashier, as are specifically enumerated in the statute. *See Case v. First National Bank of City of Brooklyn,* 59 Misc. 269, 109 N.Y.S. 1119 (N.Y.Sup.Ct.1908). We disagree. Rather, we hold that the determination of this issue must be made by consideration of the purpose behind the National Banking Act, *i.e.,* the power to dismiss a bank officer at will reflects the Congressional mandate to establish an independent national system in order to maintain the stability of, and promote the welfare of, national banks. *See Easton v. Iowa,* 188 U.S. 220, 23 S.Ct. 288, 47 L.Ed. 452 (1903); *Westervelt v. Mohrenstecher,* 76 F. 118 (8th Cir.1896); *see also Lane v. Chowning,* 610 F.2d 1385 (8th Cir.1979); *Kozlowsky v. Westminister National Bank,* 6 Cal.App.3d 593, 86 Cal.Rptr. 52 (1970); *Kemper v. First National Bank in Newton,* 94 Ill.App.3d 169, 49 Ill.Dec. 799, 418 N.E.2d 819 (1981); *Van Slyke v. Andrews,* 146 Minn. 316, 178 N.W. 959 (1920); *McGeehan v. Bank of New Hampshire,* 123 N.H. 83, 455 A.2d 1054 (1983); *Copeland v. Melrose National Bank,* 229 App. Div. 311, 241 N.Y.S. 429, *aff'd,* 254 N.Y. 632, 173 N.E. 898 (1930).

As stated in *Westervelt, supra,* "active officers, to whose integrity and discretion the monies and property of the bank and its customers are entrusted, should be subject to immediate removal whenever the suspicion of faithlessness or negligence attaches to them."

Alegria had the bank's authority to make unsecured loans of up to $15,000.00 and secured loans of up to $25,000.00, and was responsible for loan documentation. Alegria was responsible for day-to-day operations within the Eagle branch of the bank, and upon the absence of Brown, Alegria assumed the full managerial duties of the Eagle branch.

Hence, we hold that the district court was correct in its order of summary judgment and its ruling that as a matter of law Alegria fell within the strictures of 12 U.S.C. § 24 (1982) as an "other officer" of a national banking association, whom the board of directors was empowered to dismiss at will regardless of the provisions of an explicit or implicit contract of employment otherwise enforceable under the provisions of state law. We need not agree with the philosophy of, nor the power delegated by, the Congressional enactment, but are nevertheless bound thereby.

The record before us, and before the district court, contains voluminous documentations of the duties and responsibilities of Brown and Alegria and other officers and employees of the bank. Hence, no factual question remains for resolution at trial regarding the duties, responsibilities and authorities of Alegria.

The orders of the district court are affirmed; costs to respondent.

DONALDSON, C.J., and WALTERS and McFADDEN, JJ. Pro. Tem., concur.

BISTLINE, Justice, dissenting.

As the majority opinion notes, the court below decided the case on defendant's Mo-

tion for Summary Judgment, and ruled *as a matter of law* that Mr. Alegria could be dismissed without cause under 12 U.S.C. § 24 (Fifth), the National Bank Act of 1864. The *matter of law* ruling was based upon the proposition that an assistant manager of a branch bank was included under "other officers such as a president, a vice-president, and a cashier." The lower court's ruling was made June 25th, 1986, approximately *27 months* after the filing of the Answer to the Complaint, and over *two years* after the defendant's Motion for Summary Judgment was filed, but obviously not brought on for hearing. Equally obvious is that the parties perceived that the cause of action pleaded would involve the circumstances of Mr. Alegria's tenure with the bank and the justness of his discharge vis-a-vis the bank's policy declared in the personnel manual.

The Complaint in this action was filed in February of 1983, based on the claim of wrongful discharge in violation of defendant bank's own personnel manual, which the plaintiff alleged offered inducements of considerable benefits to those who would remain with the bank to the exclusion of other opportunities. Mr. Alegria worked for the bank for 16 years until his discharge. The Complaint contained a demand for jury trial.

The defendant bank answered the Complaint at the end of March in 1983, admitting some paragraphs, denying others—some on lack of information or belief, but specifically and of much importance pleading Four Affirmative Defenses [1]—*none of* which were based upon or mentioned in Section 24 (Fifth) of the National Bank Act. Thereafter extensive and expensive depositions were taken by both parties of a number of bank personnel. By discovery proceedings plaintiff obtained certain bank records.

The depositions are voluminous, but the plaintiff's brief in this court has excerpted portions which are pertinent to the claim alleged, and are interwoven with the brief's statement of the case:

## STATEMENT OF THE CASE

Mr. Fred Humphreys' deposition was taken on February 27, 1984 and at that time he was the President and Chief Executive Officer of the defendant.

Mr. James Burum's deposition was taken on February 27, 1984. At that time Mr. Burum was Executive Vice President in charge of Branch Administration.

The deposition of Mr. Alfred W. Sturr was taken on February 27, 1984. He was employed by the defendant from November 1977 until January 1984 in the position of Vice President, Director, Human Resource Services and a member of the personnel committee.

Mr. Philip Desilet's deposition was taken on February 27, 1984. At that time he was Branch Supervisor of the defendant.

On September 20, 1965, or thereabout, the plaintiff and the defendant entered into a contract of employment whereby the plain-

---

**1.** FIRST AFFIRMATIVE DEFENSE—The alleged agreement set forth in the complaint herein by its terms was not to be performed within one year from the making thereof and neither said agreement nor any note or memorandum thereof was ever made in writing and subscribed by the party to be charged therewith or his lawful agent as required by the laws of the State of Idaho.

SECOND AFFIRMATIVE DEFENSE—The alleged agreement set forth in the complaint herein is void for want of consideration and/or lack of mutuality of obligation.

THIRD AFFIRMATIVE DEFENSE—The right of action set forth in the complaint herein accrued more than six months prior to the commence-

ment of this action. In the State of Idaho, at all times mentioned in the complaint since the time when the right of action alleged in the complaint accrued, there were and now are statutes of limitations which provide that actions such as that alleged in plaintiff's complaint must be commenced within six months after the cause of action accrues.

FOURTH AFFIRMATIVE DEFENSE—Defendant denies that plaintiff had any right to participate in any grievance procedures, however if the court finds that such right existed, plaintiff is estopped and has waived his right to assert his claim against defendant by reason that, among others, plaintiff failed to take advantage of such grievance procedures.

tiff was employed by the defendant in its banking business as a messenger.

Such contract of employment was from time to time thereafter changed in many particulars including but not limited to position, duties, salary, bonuses, vacations, medical insurance, and retirement.

Such contract of employment was further changed from time to time by the preparation and distribution by the defendant to its employees including the plaintiff of a written manual and by the defendant representing to its employees and by the defendant agreeing with its employees that the defendant would comply with such written manual and in particular would comply with such written manual as to the method of and grounds for the discharge by the defendant of its employees including the plaintiff.

Mr. Fred Humphreys testified beginning at line 5 of page 16 as follows:

Q   Do you have a personnel manual?

A   Yes.

Q   How long has there been a personnel manual?

A   I don't know.

Q   Using your best recollection, how long would you say?

A   Well, there was some personnel, printed personnel policies and memorandum forms when I came to work 30–some years ago.

Q   And this has developed into a more comprehensive publication all the time?

A   Well, as regulations and all those things peripherated the manual has become thicker.

Q   Changed from time to time?

A   Yes.

Q   How are the changes initiated?

A   Depends on what type of change it is, I guess.

Q   Give me an example of one that you know of recently.

A   Well, changes in the law.

Q   Has changed the personnel manual?

A   Would change the personnel manual, a change in regulations would change the personnel manual.

Q   In benefits?

A   Yes.

Q   And the manner of handling grievances?

A   I don't think the law would change that to any great extent.

Q   Has the personnel manual changed in that regard since you have been with the bank?

A   Yes.

Q   So it's kind of a continually changing document?

A   Yes.

Q   Is the personnel manual available to anybody employed by the bank?

A   Yes.

Q   It is located throughout the branches, either it or copies of it?

A   Yes.

Q   It is your understanding the employees are expected to follow the personnel manual?

A   Well, the personnel supervision are expected to follow the personnel manual.  I don't know how closely the employees might keep up on the personnel manual.  It is for guidance for both, but supervision probably has more to do with it.

Q   Not an optional thing with an employee.  Can he either abide by it or disregard it?

A   No, but in many cases it is a judgmental thing.

Q   You mean there are subjective judgments that come into play?

A   It is an outline of policy, and in some places very definitive when it comes to items of law and regulation and regard to policy, it's a policy guideline, so you can find both things in it.

Q   Are the employees advised or encouraged to believe that the bank will follow the personnel manual?

A   I don't know what shape that would take.

Q   Are they advised that the bank will not follow the personnel manual?

A  I don't know if they are advised particularly either way.

Q  Is it a fact it is published?

A  It is published and circulated, therefore it would have some validity.

Q  With the intent it would be abided by the bank?

A  Yes.

Q  Is it the purpose of the bank to have the employees rely on the personnel manual?

A  I would think generally so.

Q  Does the personnel manual apply to all bank employees?

A  That is right, in the particular description where they fall within the personnel manual.

Q  Does it apply to you?

A  I think so.

Q  Does it apply to the custodian?

A  I think so.  There are particular sections of it.  Some apply differently than others.

Mr. Alfred W. Sturr testified beginning at line 21 of page 33 of his deposition as follows:

Q  Did the bank advise the employees either written or verbally that they must follow the personnel manual?

A  As guidelines, yes.

Q  While you were in the position you held with the Idaho First National Bank, is it a fair statement to say that it was not optional with the employees whether they complied with or followed the personnel manual?

A  I would say they had to comply with the personnel manual.

Q  While you were with the Idaho First National Bank, were the employees advised either verbally or in writing that the bank itself would follow the personnel manual?

MR. WARD:  Object to the form of the question.  I cannot tell and I don't know whether the witness can whether you mean by the bank, do you mean employees of the bank, all employees of the bank, or certain employees of the bank?

BY MR. EISMANN:

Q  Do you understand the question?

A  I was going to—thank you, John.  I was going to ask you too what do you mean by that.

Q  Employees you define as anybody employed by the bank?

A  That is correct.

Q  Was it the bank's official position that all employees were to follow the personnel manual?

A  In the general sense, yes.

Q  Was it the bank's official position and were the employees advised that the bank in its handling of the employees would follow the personnel manual?

A  Yes.

Q  Again, always referring to within your knowledge during your term of employment with the Idaho First National Bank, was it the intent of the bank that its employees rely on the personnel manual?

A  Yes.

Q  Is there any employee of the bank to which the personnel manual did not apply?

A.  No.

Defendant offered and agreed to such changes to such contract of employment from time to time relating to position, duties, salary, bonuses, vacations, medical insurance and retirement as aforesaid and offered such changes to such contract of employment from time to time relating to such written manual as aforesaid to induce the plaintiff and its other employees to continue in the employment of the defendant until retirement.

Mr. Alfred W. Sturr testified beginning at line 2 on page 7 of his deposition as follows:

Q  What advice to your knowledge is given to an employee upon his initial hiring as to the length of his term of hiring?

A  When you hire an employee, you hire them until they retire.  If one can pass the probationary period, which is six months and their work is at a level in

which it should be while they are employed by the organization.

The plaintiff testified in his deposition beginning at line 5 on page 174 as follows:

Q  You were present when Mr. Humphreys testified and other administrative officers, and former administrative officers of the bank testify that the employees' benefits that we have described were offered, as I recall, to create a feeling of job security and permanence in the employ, and to induce the employee to continue their employment?

A  Yes.

MR. WARD: Object to the form of the question.

Q  BY MR. EISMANN: Did it in fact have that affect on you?

A  Absolutely.

The written manual as aforesaid was published and distributed by the defendant to assure its employees including the plaintiff that an employee would only be discharged in the method prescribed and for a cause specified in such written manual.

Mr. Fred Humphreys testified in his deposition beginning at line 16 of page 15 as follows:

Q  Is it your understanding of the policy of the bank, and by bank, we are referring to Idaho First, have occasion to discharge an employee only for just cause?

A  Certainly.

Q  Are the employees made known of that fact in numerous ways?

A  I would suggest so, yes.

Mr. Alfred W. Sturr testified in his deposition beginning at line 22 on page 25 as follows:

Q  While you were in the position you held with the Idaho First National Bank, was it the policy of the bank to discharge an employee only for just cause?

A  Yes.

Q  Is that fact made known to the employees by the means you mentioned

such as—what is it, First Talk, an employee meeting and so forth?

A  I believe so.

The plaintiff accepted such offers of the defendant to change such contract of employment from time to time relating to position, duties, salary, bonuses, vacations, medical insurance and retirement as aforesaid and also accepted such offers of the defendant to change such contract of employment from time to time relating to such written manual as aforesaid with the understanding that such contract of employment would continue as amended from time to time until the retirement of the plaintiff or until the plaintiff was discharged in the manner and for one or more of the causes specified in such written manual.

The plaintiff testified in his deposition beginning at line 22 on page 174 as follows:

Q  BY MR. EISMANN: What was your understanding as to the methods available to the Idaho First National Bank to terminate your employment?

A  Due cause, just cause.

Q  The causes set forth in the employment manual?

A  Right.

Q  Did you consider your employment permanent, except if discharged for just cause?

A  Absolutely.

MR. WARD: Object to the form of the question.

Q  BY MR. EISMANN: Aside from the employee benefits and inducements that you have indicated, is there anything else that led you to the conclusion that your employment was, so to speak, permanent?

A  I don't understand the question.

Q  Are there any documents that indicate your employment was permanent?

A  I think there is a document when I was first hired that I was a permanent employee after the probationary period.

Q  That was produced by the bank?

A  That's correct.

Q The production in this case?

A That's correct.

The plaintiff testifies in his deposition beginning at line 6 on page 177 as follows:

Q Based on your knowledge and the period of time you spent in the employment of the bank, was it their practice or did they ever claim to have the right to similarly discharge employees without cause?

A I was not aware of it.

Q Did you ever see it happen, to your knowledge?

A Not to my knowledge.

Q In continuing your employment with the Idaho First National Bank, did you rely on your own job security on what you observed the bank practices seemed to be with other personnel?

A Yes.

Q Did you rely on the personnel manual?

A Yes.

Q Did you rely on the continued increased benefits themselves?

MR. WARD: I object to the form of the question, move that the question be stricken.

Q BY MR. EISMANN: Did you rely on the increases in salary?

A Yes.

Q And increases in fringe benefits?

A Yes.

Throughout the period during which the plaintiff continued in the employment of the defendant, the defendant substantially complied with such written manual and in particular complied with such written manual in the method of and grounds for discharging its employees.

Such contract of employment was to continue until the retirement of the plaintiff or until the discharge of the plaintiff by the defendant for a breach of such contract of employment by the plaintiff.

It was the intention of the defendant that the plaintiff would rely on such changes to such contract of employment as aforesaid so that the plaintiff would feel secure in such employment, would continue as an employee of the defendant, would plan to continue as an employee of the defendant until retirement, would not seek other employment and would not pursue other business opportunities or interests.

Mr. Alfred W. Sturr testified in his deposition beginning at line 6 of page 19 as follows:

Q In your function relating to personnel matters, is it a correct statement to say that the bank's objectives are to seek orderly, cooperative, loyal employees?

A What do you mean by orderly?

Q Opposite of disorderly.

A Yes.

Q Is the bank seeking to maintain as low a turnover among its employees as possible?

A Yes.

Q Does the bank intend to offer job security to its employees?

A If they are performing their job, yes.

Q In your opinion as a person trained in your particular skills in the job you held with the Idaho First National Bank while you were employed by it, could the bank attract and hold the caliber of employees it seeks without the employees feeling reasonably secure in his job?

A I don't understand that question.

MR. EISMANN: Could you read that question back?

(Whereupon, the question was read by the reporter.)

THE WITNESS: No.

BY MR. EISMANN:

Q What things does or did the bank do while you were in the position you have described with the Idaho First National Bank to retain its employees?

A Give them excellent training programs.

Q Training programs? Okay.

A Good compensation and benefits programs.

Q Would that include bonuses with periodic salary increases?

A  That is correct. The opportunity for advancement.

Q  Anything else?

A  That is all.

Q  I note in going through the material that has been given to me, that there are free checking accounts, banking services either free or provided at a reduced cost to the employee?

A  That is correct.

Q  Is the purpose of that to give further inducement to the employee?

A  That may be a minor one. I don't believe that is a major one.

Q  The bank does it to encourage loyalty to its employees, does it not?

A  Yes, that is a benefit.

Q  Retirement plans. Are there retirement plans?

A  They have an excellent retirement plan.

Q  What is the purpose of the retirement plan?

A  To take care of an individual after they have worked for the organization after a period of years to take care of them after they are retired.

Q  Does that encourage the employee to continue to work to gain benefits under the plan?

A  That is correct.

Q  Are they given any paid vacation?

A  Yes, they are.

Q  Is that a fringe benefit designed to make the employees' lives a little easier and increase their loyalty to the bank?

A  Yes.

Q  Are they given moving allowances?

A  Yes.

Q  Is that to make their advancements easier financially for the employee so that they can advance with less financial stress to themselves?

A  That is correct.

Q  Do they have a plan for the sale and purchase of homes for employees who are transferring?

A  They do.

Q  Is that for the same purpose as the moving allowance?

A  That is correct.

Q  They have a life insurance program for the employees?

A  Yes, they do.

Q  Health care plan?

A  Yes, they do.

Q  Disability plan?

A  Yes.

Q  And then is there a program whereby they give special recognition to an employee who has completed his 5th year, 10th year, 15th year and 20 years of service to the bank?

A  The only one I can think of is the added week of vacation, plus the service recognition award.

Q  What is the purpose of those?

A  To thank the employee for their longevity with the organization.

Q  And I suppose to let the other employees know who have not attained that length of service as yet, there is appreciation and encouragement by bank administrative personnel to encourage others to stay with the bank and continue their service?

A  That is correct.

Q  So the things that you mentioned, all the things you mentioned then are benefit programs adopted by the bank to induce the employee to continue in the employment of the bank; is that accurate?

A  Yes.

The plaintiff did rely on such changes to the employment contract and as a result of such reliance the plaintiff did feel secure in such employment, did continue as an employee of the defendant, did plan to continue as an employee of the defendant until retirement, did not seek other employment and did not pursue other business opportunities or interests.

Under such contract of employment, 65 years of age was the normal retirement age.

On May 21, 1982, or thereabout the defendant discharged the plaintiff.

Mr. Philip Desilet testified in his deposition beginning at line 1 on page 80 as follows:

Q In Mr. Alegria's case, why wasn't he given a written reprimand?

A Because I felt that the circumstances surrounding those points on which I finally terminated him were so serious they had to be dealt with on a day to day basis with the manager and that the manager had to correct them.

Q Why wasn't he given some probation or a program of working out of it?

A You will have to ask the manager why.

Q You could have done that, couldn't you?

A I could have, yes.

Q Why didn't you?

A Because I was dealing with the manager.

Q Mr. Alegria was fired because the manager from your point of view didn't do his job?

A I dealt with the overall performance of the office, how that was accomplished. But the manager in this case, the manager told me the assistant manager was performing satisfactorily and I told him he was not, I detailed those areas that I did not think he was performing satisfactorily and I left it up to him to handle the situation.

Q Then, the answer, I guess, is yes, that Mr. Alegria in effect was terminated, from what you tell me, because Mr. Brown did not perform his job correctly; is that accurate?

MR. WARD: I am going to object to the form of the question, mischaracterizes his testimony. He stated a number of deficiencies for which Mr. Alegria was terminated but belonged only to Mr. Alegria. The only thing that was left for Mr. Brown was to correct them.

BY MR. EISMANN:

Q So he was fired because the manager didn't correct his deficiencies?

A Yes.

Q I guess then it would be a fair statement to say you were aware that the manager was not correcting the deficiencies you pointed out to him, among others the bank image, the personnel problems, the physical plant; is that accurate?

A I am sorry. I am not too sure I understand your question.

Q Were you aware, and I guess that is the reason as you stated, that Mr. Brown was fired is because he was not carrying out the programs you suggested?

A Yes.

Q And one of the programs you suggested was to counsel or do whatever needed to be done to obtain from the assistant manager a performance level which was acceptable; is that correct?

A He told me that he was dealing with that situation and I told him he was not dealing with it in a satisfactory fashion, yes.

Q What made you think that Mr. Brown could deal with the problem as you analyzed it with Mr. Alegria?

A He could have found out what the problem really was and what was being done about it. It is evident he was not doing that, it was evident from our customers, it was evident from the employees, it was evident from the employees who had terminated.

Q I guess then had he adequately dealt with the deficiencies you assessed to Mr. Alegria so that Mr. Alegria corrected those, then maybe Mr. Alegria would still be employed?

A No, I wouldn't say that because I told you that when Mr. Alegria walked in that office, I was not satisfied with the reports I had had on his overall performance and he never was, I never saw any evidence that changed my opinion all the time he was at Eagle.

Q So then this firing of Mr. Alegria was simply because you had concluded he was not an adequate personnel when you first became acquainted with him?

A Look at the way he was dealing with Dorothy Kirk.

Q Is that correct?

MR. WARD: He just answered your question.

MR. EISMANN: No, he didn't.

MR. WARD: He certainly did. He said look at the way he was dealing with Dorothy Kirk. That occurred years after he came to Eagle.

MR. EISMANN: That is what I am talking about.

BY MR. EISMANN:

Q You made up your mind you were going to get rid of him when you first became aware of him?

A No, that is not the case at all. I made up my mind I had to live with him and I was going to change his performance.

Q How did you change his performance?

A Through the manager.

Q But you knew the manager was not following your suggestions in any other areas, or were you trying to change the manager's performance; is that correct?

A He was telling me differently. He had his head in the sand.

Q You became aware of that because you recommended his dismissal, didn't you?

A Yes.

Q I will go back to a question I asked earlier, had Mr. Brown effectively counseled with Mr. Alegria so that Mr. Alegria's performance became satisfactory from your point of view, then Mr. Alegria would still have a job?

A That is not true, he would not have a job.

Q He would have been fired in any event then?

A For other reasons. We were only dealing with the tip of the iceberg, those things that were shown up and most serious and immediately importance, but he was not doing any of the other responsibilities an assistant manager normally does in an office. We had not dealt with those yet, we had not even touched on them.

Q What were they?

A The development of people. We were so busy taking care of the poor customer service and he was reading the Wall Street Journal while customers were asking for him out in the lobby, and these types of things, we could not get to the other things, the profitability of the office, waived service changes, credit life waived, overdraft charges, definition of the market, who your customers are.

Q Did you ever talk to Mr. Alegria about those things?

A Hell no, I don't deal that way. I deal with the manager.

Q All right. If the manager had done his job according to what you are telling me, my question is if Mr. Alegria properly responded, Mr. Alegria would still have a job?

A If he had responded in every one of the areas, but there was an armload of areas.

Q But if he had responded?

A Sure.

Q He would still have his job, is that correct?

A That is correct.

When discharged as aforesaid, the plaintiff held the position of Assistant Manager of the office of the defendant at Eagle, Idaho.

When discharged as aforesaid, the plaintiff had continued in the employment of the defendant for more than 16 years.

The defendant discharged the plaintiff as aforesaid without any cause specified as a cause for discharge by the terms of such contract of employment or without any cause specified as a cause for discharge in such written manual.

The defendant discharged the plaintiff as aforesaid without following any of the procedures, notices and hearings specified by the terms of such contract of employment and without following any of the procedures, notices and hearings specified in such written manual.

On February 18, 1983, the plaintiff filed this action alleging that the defendant breached such contract of employment and breached its duty of good faith and fair dealing required of the defendant under the terms of such contract of employment in discharging the plaintiff as aforesaid.

Mr. Alfred W. Sturr testified in his deposition beginning at line 7 on page 23 as follows:

Q   Does the bank intend to convey to its employees that it will deal in good faith with them and will deal fairly with them?

A   Yes.

Q   That is conveyed to the employees in many, many ways; is that correct?

A   Yes.

Q   And conveyed both formally and informally, in other words by bulletins, personnel manuals and anything that sets forth that course?

. . . .

A   Through employee meetings, by the branch managers, the department heads, through the in-house newspaper, those things have been defined.

. . . .

The defendant has a staff of administrative officers which oversee its some 72 branch offices located throughout Idaho.

Mr. Fred Humphreys testified in his deposition beginning at line 7 on page 9 as follows:

Q   You have what is referred to for instance in this financial statement, administrative officers.

A   We have officers that are non-branch people, yes.

Q   Your administrative officers are located in this building?

A   Not necessarily.

Q   Are there some located elsewhere?

A   Yes.

Q   Where is that?

A   I don't know.  We have two or three locations, I don't have addresses—27th and Main is real estate people.  I don't

know, down here on 8th Street we have—

Q   What officers are located in this building?

A   Pardon?

Q   What officers are located in this building?

A   Every one.

Q   By general description.

A   You will have to give me a list of our administrative offices.  I am not sure I can tell you then all of them, but senior management is located in this building, our legal counsel is located in this building, our branch supervision is located in this building, our marketing people are located in this building. Most of our data processing people are located in this building, our credit review is located in this building, our human resource function is located in this building.  Part of our mortgage function is located in this building. There are probably others that don't really come to mind.

Q   The supervision extended to the officers who give the supervision to the branch offices of the bank, are they located in this building?

A   Yes.

Q   Do you generally refer to the offices located in the building as the administrative offices?

A   I don't.

Q   Do you use the term administrative offices?

A   Yes, occasionally.

Q   Who are the administrative officers?

A   *By what kind of a definition? There is a legal SEC definition, there are comptroller definitions, there is, I suppose, internal definitions, there are public perceptions.  Which one do you want to use?* (Emphasis supplied)

Q   The one you would use in your financial statement.

A   The one we use in our financial statement lists the five highest paid officers.  At what point in time would you

like to know that, it changes from time to time?

Q   In this particular report, there are nine officers listed as officers of the bank. Are those, each of those gentlemen at the time this was published, administrative officers of the bank?

A   Yes, not all of them had direct contact with branches or branch supervision per se, some of them did, most of them did, but these people were all in quotes administrative positions.

Mr. James Burum was the supervisor of branch administration and he testified at his deposition beginning at line 7 on page 5 as follows:

Q   Outline for me your duties and responsibilities as branch supervisor.

A   In simple terms, it is to manage the branch system to meet the financial objectives of the bank.

Q   In that regard, you have other officers working directly under you?

A   Yes.

Q   I take it that you are responsible for that department, if we can call it a department, is that correct?

A   Yes.

Q   And supervise those people who supervise the branches?

A   Yes.

Mr. Philip E. Desilet testified in his deposition beginning at line 14 on page 4 as follows:

Q   What other positions have you held in the last five years with the Idaho First?

A   I was branch supervisor previously.

Q   Would you describe that position, what were the responsibilities and duties?

A   I supervised a number of branches in our organization throughout the state.

Q   Will you tell us which ones you supervised?

A   There was quite a few. At last, I think there was 16.

Q   Really. Are they all in the same area?

A   No, they are not.

Q   Give us at least a handful what you did supervise.

A   I supervised the head office in Boise, Idaho Falls, Main office. Lewiston, main office, Priest River, Eagle.

Q   Any others in the Boise Valley?

A   Yes.

Q   What would they be?

A   Broadway, Capital, the head office, West State, Eagle—I think I have covered them.

Q   How long did you serve as branch supervisor?

A   For about 15 years.

Q   Who did you report to or who were you responsible to?

A   Jim Burum was the last officer I reported to.

Q   How long, during what period of time, did you report to Mr. Burum?

A   Several years. I am not sure.

Q   Did that include all the years that Mr. Brown was manager at Eagle?

A   No.

Q   What would be different?

A   I believe Mr. Hodges held that position prior to Mr. Burum.

Q   As branch supervisor, what are your duties?

A   To pursue the objectives of the bank and making a branch operation perform to those objectives.

Q   What are the objectives?

A   Those objectives vary from time to time.

Q   Give me the classification these objectives would fall into.

A   They would fall into total performance of the bank at the time.

Mr. Philip E. Desilet further testified in his deposition beginning at line 14 on page 8 as follows:

Q   In your capacity as branch supervisor, apparently you have the control and the direction of the managers of the branches, you supervise and assist managers and their employees?

A   That is correct.

It is readily seen from an examination of just that much of the depositions that both parties were pointing toward a trial which would revolve around the bank's termination of Alegria as being within or without the policy declarations of the personnel manual. All counsel involved would not have pursued such extensive discovery if it was then, at that time, thought that the bank could obtain a dismissal by relying upon the "at pleasure" language of the National Bank Act. Not only is that inference readily drawn, but the Motion for Summary Judgment does not make any claim, or mention of any claim, that the bank was entitled to a dismissal under the provisions of the National Bank Act. The motion did have attached to it the affidavit of defendant's Association Secretary who also acts as custodian of minutes of meetings of the Board, and attached to her affidavit was her certificate of minutes of the Board of Directors pertinent to the promotion of the plaintiff and the erstwhile other plaintiff, Mr. Brown. But the Motion, as was so with the Answer filed two months earlier, did not make any mention of the National Bank Act.

What is not discernible from the record presented is when, if, and how the defendant urged upon the Court the National Bank Act. Assuming, arguendo, that it did so with the Memorandum of Authority said to be attached to its Motion, such only serves to fortify the proposition that it thereafter participated in extensive discovery in order to convince the trial court that an assistant manager is an officer within the "at pleasure" dismissal language of the National Bank Act.

But, the district court was able to avoid any consideration of all that voluminous discovery material by deciding the issue solely *as a matter of law*. The court's written Order of Judgment is abundantly clear in that respect: the court ruled "having considered the pleadings," (with no mention of the ruled depositions and other discovery documentation) and "having found *as a matter of law* that 12 U.S.C. § 24 (Fifth) is applicable," and "the court having concluded that the term 'other officers' . . . includes managers and assistant managers of branches of national banks." The parties, however, as is made obvious from the amount of effort and expense expended in developing the facts, had not so readily convinced themselves that "other" officers was all that inclusive. On this appeal Mr. Alegria and his counsel argue mainly that summary judgment as a matter of law was improper.

The incongruity of the whole situation is exemplified by just a cursory reading of the two sets of briefs. Alegria refers to the depositions in support of his contentions that he was wrongfully discharged in violation of the bank's own policy and personnel manual, made part of the record by exhibit.

On the other hand, in supposed justification of the discharge, the bank's brief repeatedly makes reference to the depositions, and based upon the content thereof, *then* argues the law.

The district court did not do so. In turn, however, the majority opinion for this Court does do so, which seems to be inappropriate.

The attachment to the Motion for Summary Judgment reads that Mr. Alegria, an "employee" was on September 18, 1969, promoted to the position of "Installment Loan Officer," Broadway Office from the prior position of "Loan Clerk" in the same office. On March 18, 1982, the attachment reads that Mr. Alegria, as an "officer" was nominated and elected to the position of Assistant Branch Manager II, Valley Office.

Part of the appeal record, but not a part of that particular attachment, is a Resolution which shows that Mr. Alegria, as an *"employee"* was, effective as of January 1, 1979, *promoted* to Assistant Manager, Eagle-Valley officer, from the prior position of Assistant Manager, Homedale Office.

Rather evident, so it would seem, the bank itself was uncertain whether Mr. Alegria was an employee, or an employee titled as an officer. But, it is extremely

important to note, the bank seemed not at all certain that managers and/or assistant managers were or were not officers who, as being of rank equivalent to presidents, vice-presidents, or cashiers, could be discharged at the bank's pleasure and without cause.

If any one fact singularly important emerges from this record, it is that the bank does not claim that it ever strongly enough considered managers and assistant managers to be dischargeable at will that, acting in honest and fair-dealing, it so advised those employees who were being elevated.

It would be patently unfair to give an employee a title which would qualify him as an at will employee without so informing him, and it would be patently unfair for a bank to know of its secret weapon, i.e., the National Bank Acts § 24 (Fifth) and not so inform its personnel—whether an employee is an employee, or a titled employee. As a matter of state law a bank should be held estopped from using the shield of the National Bank Act to thwart the day in court of an employee who alleges that he has been wrongfully terminated in violation of established bank custom and practice and the bank personnel manual.

If any other member of this Court had, until this particular case come before it, ever heard of this secret weapon, no one has voiced such knowledge within my hearing. Nor had I ever before heard of such a provision. Nor would I have even expected to see it applied to branch managers and assistant managers especially as a matter of law on aught but a reading the allegations of the pleadings.

The secret weapon undoubtedly had a salutory purpose when applied to those officers who actually are in control of a bank—but not to those who exercise a closely supervised and very limited discretion in managing branch banks.

The trial court did not furnish us with any Memorandum Decision explaining the rationale by which the legal conclusion was reached that branch managers and their assistants can be summarily discharged as

being officers within the contemplation of the National Banking Act. Apparently in the trial court's view any employee upon whom the bank's board of directors confers the title of officer (of any type for any function) is susceptible to being discharged at pleasure.

Mr. Alegria was entitled to have a jury decide whether he was an officer of sufficient rank to be dischargeable at will, and whether he had been informed of such a possibility, and also whether the bank's conduct was in conformance with or contrary to its own personnel manual and its own custom and practice.

In closing argument of the brief submitted by Mr. Alegria's attorney are these statements which serve to demonstrate factual issues which Mr. Alegria has a right to have submitted to a jury:

The Federal Reserve Act 12 U.S.C. 341 (Fifth) provides as follows:

> Fifth. To appoint by its board of directors a president, vice president and *such other officers and employees* as are not otherwise provided for in this chapter, to define their duties, require bonds for them and fix the penalty thereof and to *dismiss at pleasure such officers or employees.* (emphasis supplied)

This act specifically enumerates "employees" so it is clear that an employee is to be distinguished from "such officers" and that the Congress knows how to use language to broaden the scope of those to be included so as to include employees when that is the intent of Congress.

The term "assistant manager" of the Eagle office of the defendant is unknown to the National Banking Act.

What is included in the term "other officers" as used in the National Banking Act isn't subject to the control of the defendant. The defendant can't call its president by the name "supervisor" and exempt that officer from the act any more than it can call the janitor "maintenance officer" and make the position of janitor subject to the act.

The defendant in its organizational charts set out in its annual reports (supplement to affidavit of Russell S. Brown) consistently sets out its administration offices as distinct from its various bank officers throughout the state. There were some 72 of these offices throughout the state listed in its 1983 financial reports. Those offices listed under "administration" clearly are the persons who determine policy and operate the bank in the largest sense of those terms.

The purpose of 12 U.S.C. Sec. 24 (Fifth) would appear to be to reserve to a national bank the power to dismiss at will the president, vice president, cashier and other officers who determine the policies and operate the bank in the largest sense of those terms so that the determination of bank policy and the operation of the bank cannot be contracted away *by* those very same officers *to* those very same officers.

That purpose is not served by making every employee of a national bank subject to dismissal at will.

That purpose is contrary to the declared purpose of the officers of the defendant as stated in their depositions where they testify as to the efforts of the defendant to make its employees feel secure in their employment.

That purpose is not served by the defendant's dismissal without cause and without compliance with its own personnel manual of an assistant manager of its Eagle office, one of its 72 offices scattered throughout Idaho.

A brief comment on the majority opinion is in order. It says of the *Wiskotoni* case that the court "conceded that the manager of a national banking association falls within the term 'other officers' of U.S.C. § 24 (Fifth)." This may be so, but I am unable to find that concession. What was said was: "The question of whether a branch manager is an officer to whom § 24 (Fifth) applies has not been resolved by the courts." *Wiskotoni v. Michigan Nat. Bank-West,* 716 F.2d 378, 387 (6th Cir. 1983). Because we had never before heard

of this law, and because there is no case exactly in point, and because it is a Federal statute which must be applied, initially my vote was to certify this thorny question to the Circuit Court of Appeals, Ninth Circuit, where that court with over 30 circuit court judges to draw upon could resolve the questions for us as we have previously done for it a number of times.

As to the string of citations cited by the majority, slip opinion, p. 4, for holding thereon stated, this will come as a surprise to Mr. Alegria's attorney who has already "seen" those cases and analyzed them at p. 4 of his reply brief:

*McGeehan v. Bank of New Hampshire,* [123 N.H. 83] 455 Atlantic 2d 1054 (N.H.1983), involved the executive vice-president of defendant bank. Of course, the issue was not raised as to whether the executive vice-president was one of the "other officers" within meaning of the statute because vice-presidents expressly are found within the terms of the act. The case is therefore not in point. *Kemper v. First National Bank in Newton,* 94 Ill.App. 160 [169], 49 Ill.Dec. 799, 418 N.E.2d 819 (1981) involved a bank president who was concededly an officer. Presidents are expressly named in the act, therefore the case is no assistance to the instant situation. *Copeland v. Melrose National Bank,* 229 App.Div. 311, 241 N.Y.S. 429 (1930) was a case where again a former vice-president of defendant bank brought suit. Accordingly, this case is of no assistance. *Kozlowsky v. Westminister National Bank,* 6 Cal. App.3d 593, 86 Cal.Rptr. 52 (1970) once again involved a bank president as plaintiff who sought to recover for termination of his employment. Again, presidents are expressly within provision of the act and this case is of no assistance. In *Westervelt v. Mohrenstecher,* 76 F. 118 (8th Cir.1896) the cashier of the defendant bank brought suit against the bank for terminating him. Since cashiers are expressly covered by the statute, this case is of no assistance to the court. *Lane v. Chowning,* 610 F.2d 1385 (8th Cir.1980) was an action instituted by the

chief executive officer and chairman of the board of the defendant bank for breach of contract of employment. Again, he was concededly a member of the board and a chief executive officer. Therefore, this case is of no assistance to the Court.

*Easton v. Iowa,* 188 U.S. 220, 23 S.Ct. 288, 47 L.Ed. 452 (1903) alone of that string citation was not commented on, and for the ·obvious reason that it was entirely not on point. All that was held in that case was that the Iowa legislature was "without lawful power to make special [criminal] laws applicable to banks organized and operating under the law of the United States." *Id.* at 239, 23 S.Ct. at 293.

There is, in *Wiskotoni,* some language which is very strongly supportive of Mr. Alegria's position here:

> The Bank also argues that Wiskotoni failed to produce sufficient evidence of either an express or an implied-in-fact contract that contains a term prohibiting discharge except for cause to raise a question for the jury. At trial, Wiskotoni introduced as evidence of such a contract a portion of an employee manual apparently distributed by the Bank to new employees. The manual included the following statement:

>> You have been selected for a position because it was felt that you have the qualifications which in time will be of benefit both to you and to the Bank. Unless otherwise specified, you will be employed on a probationary basis for a period of three months. If it develops during that period that you are not pleased with your association or are not suited to the work of the Bank, your employment may be terminated, in mutual fairness, without any other reason.

> Wiskotoni argued that this statement implied that employees who had completed their probationary period would not be discharged except for cause. Wiskotoni also testified that he understood that other employees were given valid reasons for termination by the Bank when they

were discharged. Trans. at 36. Finally, Knibloe, president of the Bank, did not dispute the statement made by Wiskotoni's attorney during cross-examination that "it's your practice to dismiss for cause". Trans. at 97.

> The district court did not err in finding that this evidence was sufficient to support the conclusion that a Bank employee had a legitimate expectation that employment would be terminated after the probationary period only for cause. The Bank's statement in its employee manual certainly supports an inference that upon completion of the probationary period an employee will not be discharged without cause. Considered by itself, Wiskotoni's testimony that he had the understanding that employees were terminated only for cause by the Bank might best be viewed as merely an expression of the type of subjective expectancy that *Schwartz* [*v. Michigan Sugar Co.,* 106 Mich.App. 471, 308 N.W.2d 459 (1981) ] held to be insufficient to vest contract rights. Read in conjunction with Knibloe's testimony, and in light of the statement of the employment manual, however, Wiskotoni's testimony justifies the finding that Bank employees had a legitimate expectation that upon completion of the probationary period they would not be terminated except for cause based not only on the policy statement contained in the employee manual but also on the basis of the Bank's conduct and practices. *See Greene v. Howard University,* 412 F.2d 1128, 1135 (D.C.Cir.1969) (provisions in faculty handbook incorporated in employment contracts of faculty). Accordingly, the evidence introduced by Wiskotoni "was sufficient to create a question of fact for the jury whether there was a mutual understanding that it was company policy not to discharge an employee [except for cause] and that this policy, expressed in documents ... assertedly handed to [Wiskotoni] when he was hired, would apply to him as to other [Bank] employees." *Toussaint,·* [*v. Blue Cross & Blue Shield* (1980) ] 408 Mich. [579] at 613, 292 N.W.2d [880] at 891.

*See also Hrab v. Hayes-Albion Corp.,* 103 Mich.App. 90, 302 N.W.2d 606 (1981).

The Bank also contends that even if the evidence supports a finding that a contract was implied-in-fact, that contract at most can require that a reason be given upon the discharge, not that the discharge be for good or just cause. The Bank's contention is undercut by *Toussaint.* As the *Toussaint* court noted: "A promise to terminate employment for cause only would be illusory if the employer were permitted to be the sole judge and final arbiter of the propriety of the discharge." 408 Mich. at 621, 292 N.W.2d at 895. The district court's submission to the jury of the issue of whether Wiskotoni was discharged for cause was proper in light of *Toussaint. Id* at 621–23, 292 N.W.2d at 896.

*Wiskotoni, supra,* 716 F.2d at 386.

Finally, in my view the majority is unrealistic in pinning its holding on Mr. Alegria's "authority to make unsecured loans of up to $15,000.00 and secured loans of up to $25,000.00." Secured loans are never made to the full value of the security, and the money can hardly be said to be at risk to either the stockholders or the depositors. Moreover, secured loans, as a matter of general practice and general knowledge, are seldom, if ever, made without an appraisal first in the file. And, if a bank makes unsecured loans of $15,000.00, it will be to a good customer, and that money will seldom be at risk. In addition, bank examiners and a bank's own auditors will be periodically checking to guard against a good Assistant Manager giving away the bank's money. The majority errs in deciding the issue on such a slim reed, and is clearly guilty of usurping the function of the demanded jury.