# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48722

PATRICIA M. ALLEN,     )
     )
  Claimant-Appellant,     )     **Boise, February 2022 Term**
     )
v.     )     **Opinion filed: July 5, 2022**
     )
PARTNERS IN HEALTHCARE, INC., dba )     **Melanie Gagnepain, Clerk**
NORTH CANYON MEDICAL CENTER, )
Employer; and IDAHO DEPARTMENT OF )     <u>**AMENDED OPINION**</u>
LABOR,     )     **THE COURT'S PRIOR**
     )     **OPINION DATED JUNE 29,**
  Respondents.     )     **2022 IS HEREBY AMENDED.**
     )

Appeal from a Decision issued by the Idaho Industrial Commission.

The decision of the Industrial Commission is <u>vacated</u> and this matter is <u>remanded</u> for further proceedings before the Commission.

RandsLaw, PLLC, Twin Falls, for Patricia M. Allen, Appellant. Kirk Melton argued.

Elam & Burke, P.A., Boise, for Partners in Healthcare Inc. dba North Canyon Medical Center, Respondent. Jaclyn Gans argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Idaho Department of Labor, Respondent. Rafael Icaza argued.

———————————

ZAHN, Justice.

Patricia M. Allen appeals from the Idaho Industrial Commission's (the "Commission") decision denying unemployment benefits. For the reasons set forth, we reverse the Commission's decision.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Allen was employed by Partners in Healthcare, Inc., doing business as North Canyon Medical Center ("NCMC"), between February 5, 1999, and May 8, 2020. On May 8, 2020, NCMC's Chief Executive Officer, J'Dee Adams and Human Resource Director, Kelly

1

Herrgesell, met with Allen to discuss her job performance. Adams presented Allen with a performance improvement plan ("PIP"), which outlined examples of Allen's poor job performance and identified expectations for improving her performance. The PIP specified that Allen's performance would be tracked over the next thirty days and that Allen would be discharged if she failed to successfully complete the PIP's requirements, or if she violated NCMC's employee code of conduct or hospital policies.

Adams explained to Allen that if she wanted to forego the PIP, she could sign a severance agreement. Adams then presented Allen with a proposed severance agreement. Allen asked if she could discuss her options with her husband, but Adams said she needed to make her decision then and there. Adams also told Allen that he thought it was in her best interest to take the severance package. Allen decided to forgo the PIP and took the severance agreement.

After separating from NCMC, Allen filed an unemployment claim with the Idaho Department of Labor ("IDOL"). NCMC's response to the Idaho Department of Labor was prepared by the Idaho Hospital Association ("IHA"), NCMC's third-party administrator. Shawnee Christensen, IHA's human resources director, filled out the form and identified Allen's reason for separation as "Fired/Discharged" and indicated Allen did not receive any compensation after her separation. IDOL determined Allen was eligible for unemployment benefits.

After receiving notification that IDOL approved Allen's claim, Herrgesell sent an email to IDOL to appeal the decision. Herrgesell stated that NCMC was appealing the decision because Allen "resigned her employment after being put on a [PIP]." IDOL's Appeals Bureau scheduled a telephonic hearing for January 11, 2021. IDOL sent a hearing notice to Allen and NCMC, which stated that the hearing would determine whether Allen quit voluntarily and, if so, whether she quit for good cause or was discharged for misconduct in connection with her employment.

At the January 11, 2021, telephonic hearing, both parties testified, presented witnesses and made closing arguments. Allen was represented by legal counsel and NCMC was again represented by Christensen, IHA's human resources director. The IDOL appeals examiner asked additional questions of witnesses and ruled on objections.

Herrgesell testified that Allen had not been discharged, but instead was offered the options of staying on pursuant to the terms of the PIP or signing the severance agreement. Herrgesell explained that Allen could have continued working if she had accepted the PIP but

2

instead chose the severance agreement. Allen's counsel attempted to cross-examine Herrgesell about the factual basis for the PIP and whether the alleged performance deficiencies were violations of NCMC policies. The appeals examiner sustained objections from Christensen that the questions were harassing. The appeals examiner advised Allen's counsel that she would not require Herrgesell to answer questions about the factual basis underlying the PIP because that was not the purpose of the hearing. Rather, the purpose of the hearing was to determine whether Allen had been discharged or whether she quit for good cause connected with her employment. Allen's counsel then tried to question Herrgesell about other terminations of female employees over age 50. The appeals examiner again sustained objections from Christensen. Allen's counsel argued he was entitled to question Herrgesell about other recent terminations and the "pretextual" nature of the PIP and the severance agreement because, taken together, they indicated that Allen had no choice but to take the severance. The appeals examiner disagreed and again stated the focus of the hearing was whether Allen had been discharged and, if not, whether she could have continued working.

In response to questions from the appeals examiner, Christensen explained that she indicated on NCMC's response to Allen's unemployment claim that Allen had been discharged because Christensen believed NCMC did not want to not contest the unemployment claim. Christensen stated that "Fired/Discharged" was the only option that allowed NCMC to not contest the claim. Christensen also explained that at the time she filled out the unemployment response she did not know whether Allen had been discharged.

Allen testified next. The appeals examiner began the questioning and asked Allen why she had resigned. Allen discussed the May 8 meeting where she was presented with the PIP and severance agreement. Allen stated she had previously been on a PIP in 2017 and successfully completed it after three months. She stated that Adams told her that he thought it was in her best interest to take the severance agreement and that her request for time to think about the two options was denied. Allen stated that the May 8 meeting left her with the impression that "the writing [was] on the wall" and that if she did not take the severance agreement at that time, she "probably would be" discharged.

Allen also testified that prior to the May 8 meeting she had applied for a promotional position and had not been selected. Allen stated she felt "harassed and bullied" by her new supervisor. Herrgesell testified that Allen complained to Herrgesell that her new supervisor was

3

being too "restrictive." Although Allen was aware of NCMC's grievance procedures, she did not file a grievance. However, Allen did request and participate in mediation with her new supervisor, with Adams as the mediator. After a second mediation meeting, Allen claims Adams said, "something's got to change or else there is [sic] going to be changes around here."

Following the hearing, the appeals examiner issued a written decision that denied Allen unemployment benefits. The appeals examiner found that Allen chose to quit and take the severance agreement rather than explore viable alternatives to continue her employment. The examiner also found that Allen did not follow the grievance procedures to report her issues with her supervisor prior to quitting.

Allen appealed the appeals examiner's decision to the Commission and requested a new hearing and an opportunity to file a brief. The Commission denied Allen's motion for a new hearing but granted her motion to file a brief. The Commission gave several reasons for its decision denying a new hearing. First, it stated that Allen appeared to be building a case for age-based discrimination under "the Civil Rights Act" and an unemployment benefits hearing was not a forum for a civil lawsuit. Next, the Commission noted that Allen failed to utilize the remedy of requesting that the appeals examiner reopen the hearing to take the additional evidence that Allen claimed the appeals examiner had excluded during the telephonic hearing. Finally, the Commission noted that conducting a new hearing was an extraordinary measure and the Commission was unpersuaded that the circumstances of Allen's case merited such a remedy.

The Commission conducted a de novo review based on the record of the proceedings before the appeals examiner. On March 4, 2021, the Commission entered a written decision and order affirming the appeals examiner's finding that Allen was ineligible for unemployment benefits. The Commission found that:

> Claimant quit to avoid the consequences of being placed on a Performance Improvement Plan and risk being discharged if she could not sufficiently improve his [sic] performance. Claimant may have disagreed with the basis for the performance appraisal. However, quitting in response to Employer's attempt to issue that discipline did not constitute good cause for quitting.

The Commission also found that "Adams may have encouraged Allen to take the Severance Agreement, but there is no evidence he prevented Claimant from exercising the other option." The Commission concluded that Allen quit without good cause connected to her employment and was, therefore, ineligible for unemployment benefits. Allen timely appealed.

4

## II.     ISSUES ON APPEAL

1. Whether the Commission's decision to deny Allen unemployment benefits was supported by substantial and competent evidence?

2. Whether the hearing before IDOL's appeals examiner and the Commission's subsequent denial of a new hearing violated Allen's Due Process rights?

3. Whether the decisions of the appeals examiner and the Commission violated public policy?

4. Whether Allen is entitled to attorney's fees pursuant to Idaho Code section 12-117?

## III.     STANDARD OF REVIEW

When this Court reviews a decision of the Industrial Commission concerning eligibility for unemployment benefits, "we exercise free review over questions of law, but review questions of fact only to determine whether the Commission's findings are supported by substantial and competent evidence." *Thrall v. St. Luke's Reg'l Med. Ctr.*, 157 Idaho 944, 947, 342 P.3d 656, 659 (2015) (quoting *Uhl v. Ballard Med. Prods., Inc.*, 138 Idaho 653, 657, 67 P.3d 1265, 1269 (2003)). "Substantial and competent evidence is relevant evidence that a reasonable mind might accept to support a conclusion." *Id.* "We do not re-weigh the evidence or consider whether we would have reached a different conclusion from the evidence presented." *Id.* (alteration omitted). However, we must set aside the Commission's order where it failed to properly apply the law to the evidence. *Id.*

"Idaho Code section 72-1366(5) provides that a party seeking unemployment benefits is ineligible for benefits if the claimant's unemployment is 'due to the fact that he left his employment voluntarily without good cause connected with his employment.'" *Id.* "The claimant has the burden to show that she was discharged and did not voluntarily resign." *Id.* "If the claimant was discharged, it is then the employer's burden to show by a preponderance of the evidence that the discharge was for misconduct in connection with employment." *Id.* Conversely, if the claimant voluntarily resigned, it is her burden to show that she did so because of good cause in connection with her employment. *Id.* "Each of these questions—whether the claimant was discharged or voluntarily left her employment, whether a discharge was for misconduct, and whether there was good cause for the claimant to voluntarily leave her employment—are factual questions for the Commission." *Id.* (internal citations omitted).

5

## IV.    ANALYSIS

**A. The Commission erred when it failed to analyze whether the PIP was a viable option that would allow Allen to continue working.**

Allen challenges the Commission's findings (1) that she voluntarily quit her job and (2) that she did not have good cause in connection with her employment to quit her job, contending they were not supported by substantial and competent evidence. We will address each challenge in turn.

1. <u>There is substantial and competent evidence to support the finding that Allen voluntarily quit her job.</u>

Allen argues the evidence submitted at the appeals hearing established that NCMC intended to terminate her. Specifically, Allen points to the fact that NCMC presented her with the PIP and a severance agreement at the same time, that NCMC did not permit Allen time to consider her options, that the CEO urged her to take the severance agreement, and that NCMC initially reported to the IDOL that it had discharged Allen as evidence that NCMC coerced her into quitting.

NCMC argues that Allen voluntarily quit when she accepted the severance agreement. NCMC explains that Allen was presented with two options, to accept the PIP and continue employment or to accept the severance agreement and quit. NCMC claims the PIP provided that Allen would have remained employed for the next thirty days, which contradicts Allen's claim that NCMC had already decided to fire her. NCMC concedes its initial written response to the IDOL stated it had discharged Allen but explains that Christensen was under the impression that NCMC did not want to contest Allen's claim so she had to choose "fired/discharged" to not contest the claim.

IDOL argues that even though there was conflicting evidence in the record, the Commission's decision was supported by substantial and competent evidence. The Commission concluded that Allen voluntarily quit her job because she chose to accept the severance agreement. Although Allen testified that she had no choice in the matter, Allen could have agreed to the PIP and it "would have been in her power to demonstrate sufficient improvement in her performance to retain her job." The Commission noted that Allen "may have felt pressured into accepting the severance [agreement], but in the end, it was her decision." The Commission's decision does not mention NCMC's initial response to the IDOC, in which it advised the Commission that it had discharged Allen.

6

In cases where there is a question whether an employee quit or was discharged, courts focus on the employer's words and actions in addition to the employee's interpretation. *Jackson v. Minidoka Irr. Dist.*, 98 Idaho 330, 334–335, 583 P.2d 54, 58–59 (1977). It is the employee's burden of proof to demonstrate a reasonable employee would have logically concluded the employment relationship had been terminated. *Id.* "[T]he test is whether sufficient words or actions by the employer would logically lead a prudent [person] to believe [her] tenure had been terminated." *Thrall*, 157 Idaho at 947–48, 342 P.3d at 659–60. A future concern, however, does not establish a constructive discharge. "A resignation to avoid a merely possible discharge at an indeterminate time in the future is not a discharge." *Thrall*, 157 Idaho at 948, 342 P.3d at 660 (citing *Hart v. Deary High Sch.*, 126 Idaho 550, 552–53, 887 P.2d 1057, 1059–60 (1994)).

The circumstances in *Thrall* are an example of when the employer's words and actions caused the employee to logically conclude that her employment had been terminated. In *Thrall*, the employer told the employee during a meeting that if she failed to immediately resign, she would be immediately discharged. *Id.* at 946, 342 P.3d at 658. The employee resigned in lieu of termination and the Commission concluded the employee voluntarily resigned without good cause. *Id.* We reversed the Commission's decision and concluded it misapplied the law when it determined the employee had voluntarily resigned. *Id.* at 948–49, 342 P.3d at 660–61. "[T]he distinction between a 'dismissal' and the face-saving device of a 'resignation which if not immediately tendered will be followed by dismissal' is a distinction without a difference." *Id.* at 949, 342 P.3d at 660 (citing *Alegria v. Idaho First Nat. Bank*, 111 Idaho 314, 316, 723 P.2d 858, 860 (1986)).

The facts of this case are distinguishable from those in *Thrall*. There is no indication in the record that NCMC said it would immediately fire Allen if she failed to immediately resign and take the severance agreement. The Commission noted that while Allen may have felt pressured to quit, she could have attempted to satisfy the PIP's requirements and thus retain her job. None of Adams's statements at the May 8 meeting evidenced an intent to immediately terminate Allen. Allen's subjective belief that NCMC intended to discharge her is a concern about "possible discharge at an indeterminate time in the future," which is insufficient to constitute a discharge.

Nor does NCMC's initial response to the IDOL establish that NCMC terminated Allen at the May 8 meeting. Herrgesell's and Allen's testimony at the telephonic hearing established that

7

NCMC provided Allen with two options at the May 8 meeting, and that nobody told her that she would be immediately discharged if she did not accept the severance agreement. Further, Christensen explained that she had no information about how Allen was separated from her employment but marked the separation as a discharge because she believed that NCMC did not want to contest Allen's benefits claim. The hearing officer and the Commission found their testimony credible. We conclude the Commission's decision that Allen voluntarily quit was supported by substantial and competent evidence. Our decision today, however, should not be read to condone the practice of providing incorrect information to the IDOL to orchestrate a desired outcome on an unemployment claim.

2. <u>The Commission erred in its analysis of whether Allen quit for good cause in connection with employment.</u>

Given that we have affirmed the Commission's determination that Allen voluntarily quit her job, we now examine the Commission's conclusion that Allen failed to demonstrate that she quit her job for good cause in connection with her employment. Allen argues the PIP was pretextual and vague, which suggests that there was no real possibility Allen could ever satisfy the terms of the PIP. Allen contends that the fact the allegedly baseless PIP was presented simultaneously with a severance agreement, and that the CEO urged her to take the severance agreement, establish that NCMC intended to discharge her regardless of how she performed under the PIP.

NCMC contends the PIP was a viable option because it was neither pretextual nor vague, it outlined improvement expectations, and it explained that Allen's performance would be monitored over the next thirty days. There was no indication that Allen would be inevitably discharged; but rather, if Allen successfully completed the PIP and did not violate any NCMC policies, she could keep her job. NCMC also asserts that simultaneously presenting the PIP and severance agreement did not render the PIP an invalid or nonviable option.

IDOL argues that Allen did not have good cause to quit because the terms of the severance agreement gave her "21 days to consider the severance agreement and seven days to revoke it." Accordingly, if Allen had felt pressured to immediately sign the severance agreement, she could have timely revoked her acceptance but did not do so. In addition, IDOL contends that Allen did not reasonably conclude that NCMC was going to discharge her regardless of how she performed, because she was not discharged after being placed on a PIP in 2017.

If a claimant voluntarily leaves employment, they have the burden to establish by a preponderance of the evidence that they resigned for good cause in connection with employment. IDAPA 09.01.30.450.01; *Edwards v. Indep. Servs Inc.*, 140 Idaho 912, 914, 104 P.3d 954, 956 (2004). To constitute good cause, the reason for leaving "must arise from the working conditions, job tasks, or employment agreement." IDAPA 09.01.30.450.02. Good cause is not established when the claimant's reasons for leaving are personal or non-job-related, and, therefore, not connected to the employment. *Id.* "Good cause is governed by the standard of reasonableness as applied to the average person, and not to the supersensitive." *Higgins v. Larry Miller Subaru-Mitsubishi*, 145 Idaho 1, 4, 175 P.3d 163, 166 (2007) (citing *Edwards*, 140 Idaho at 915, 104 P.3d at 957). "In order to constitute good cause, the circumstances which compel the decision to leave employment must be real, not imaginary, substantial not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous circumstances." *Edwards*, 140 Idaho at 914, 104 P.3d at 957 (citation omitted); IDAPA 09.01.30.450.03.

When the claimant has viable options available that would allow the claimant to continue working, quitting without exploring those options does not constitute good cause. *Higgins*, 145 Idaho at 4–5, 175 P.3d at 166–167. A claimant must explore all reasonable alternatives, in good faith and not simply reject them outright. *Edwards*, 140 Idaho at 915–16, 104 P.3d at 957–58. This requirement stems from the policy of encouraging an employer and employee to work out their differences without interrupting the employment relationship. *Id.* at 915, 104 P.3d at 957 (citing *Hart*, 126 Idaho at 553, 887 P.2d at 1060).

In its written decision concluding Allen was ineligible for benefits, the Commission found that Allen quit without good cause connected to her employment because the record demonstrated that Allen could have agreed to the PIP instead of the severance agreement. The Commission stated:

> Claimant quit to avoid the consequences of being placed on a Performance Improvement Plan and risk being discharged if she could not sufficiently improve his [sic] performance. Claimant may have disagreed with the basis for the performance appraisal. However, quitting in response to Employer's attempt to issue that discipline did not constitute good cause for quitting.

However, the Commission's decision failed to analyze whether the PIP was a *viable alternative* that would allow Allen to continue working. Allen specifically raised this issue in her appeal brief to the Commission, arguing that under the circumstances of this case a reasonable person

would not have taken the PIP because "[a] purported option that has no real chance of succeeding (because an Employer has no interest in retaining the employee) is not viable." Part of the good cause analysis is whether the employee had viable alternatives that would have allowed the employee to continue working. *See Higgins*, 145 Idaho at 4–5, 175 P.3d at 166–167; *Edwards*, 140 Idaho at 916, 104 P.3d at 958. By failing to analyze this issue, the Commission failed to properly apply the law concerning the good cause analysis.

When the Commission has failed to properly analyze an issue, this Court has remanded the matter for further proceedings. *O'Dell v. J.R. Simplot Co.*, 112 Idaho 870, 736 P.2d 1324 (1987) (reversing Commission decision and remanding matter because while Commission had determined claimant had been offered suitable work, it failed to analyze whether claimant had good cause for rejecting offer of employment). Here, the Commission did not analyze whether the PIP was a viable alternative to the severance agreement. Therefore, we vacate the Commission's decision and remand so the Commission can conduct that analysis.

For purposes of remand, we note that the record does not support IDOL's contention on appeal that Allen actually had 21 days to consider the severance agreement. The unrebutted testimony presented to the appeals examiner established that Allen's request for additional time to consider the severance agreement was denied by NCMC. Rather, NCMC told her she had to make a decision at the meeting.

## B. The Commission did not violate its rules or deprive Allen of her right to procedural due process.

Allen argues that the manner in which the appeals examiner conducted the hearing violated IDAPA rules applicable to the proceedings. Further, she argues that the appeals examiner's conduct, and the Commission's failure to grant Allen a rehearing, deprived her of procedural due process. Allen's briefing does not specify whether she believes she was deprived of due process under the Idaho or United States Constitutions.

Both NCMC and IDOL contend that the appeals examiner conducted Allen's hearing in conformity with the applicable IDAPA rules. In addition, NCMC and IDOL argue that Allen has waived her due process argument because she did not raise it before the appeals examiner or the Commission. They also assert that if the issue has been preserved, any errors in the process below do not amount to a due process deprivation.

1. The Commission did not violate IDAPA rules applicable to hearings for unemployment eligibility.

Idaho Code section 72-1368 sets out the process for filing a claim for unemployment benefits, and grants IDOL the authority to promulgate rules governing that process. I.C. § 72-1368(1). Section 72-1368(6) sets forth the framework for appealing eligibility determinations. Pursuant to that subsection, the director of IDOL must appoint appeals examiners, who have the authority to "affirm, modify, set aside or reverse" an eligibility determination "after affording the interested parties' reasonable opportunity for a fair hearing." I.C. § 72-1368(6). Proceedings before an appeals examiner are not governed by the Idaho Rules of Evidence, nor are they subject to the provisions of the Idaho Administrative Procedure Act. I.C. § 72-1361; *see also* IDAPA 09.01.01.015 ("[A]ll appeals within [IDOL] are governed solely by the provisions of the Employment Security Law . . . [and] these rules.").

Allen contends the appeals examiner violated three IDOL rules governing the appeals process: IDAPA 09.01.01.045.11, .12, and .13. She argues that the appeals examiner obstructed the development of evidence, made continued efforts to terminate Allen's cross-examination of witnesses, and did not require questions to be fully answered. IDAPA 09.01.01.045.11 states that an appeals examiner operates both as a fact finder and a judge and has "the responsibility of developing all the evidence that is reasonably available." IDAPA 09.01.01.045.12 provides that an appeals examiner may exercise reasonable discretion to "direct the order of witness and develop evidence in a logical and orderly manner." Finally, under IDAPA 09.01.01.45.13 an appeals examiner "may exclude evidence that is irrelevant, unduly repetitious, or excludable on constitutional or statutory grounds."

After reviewing the record, there is no basis to conclude that the appeals examiner's administration of the hearing violated any of the above rules. As discussed above, if an employee quit, the critical inquiry is whether the employee quit with good cause in connection with employment. *See* IDAPA 09.01.30.450.01. The appeals examiner appropriately exercised her discretion in conducting the hearing. As mentioned by the Commission in its order denying Allen's request for a rehearing, much of the evidence excluded by the appeals examiner related to Allen's attempts to argue a civil action for employment discrimination in a proceeding to determine her eligibility for unemployment benefits. As such, we conclude that the appeals examiner did not violate the IDAPA rules asserted by Allen.

2. <u>Allen may raise her due process arguments.</u>

11

IDOL and NCMC both argue that Allen has waived her due process argument on appeal because she did not assert it before the appeals examiner or the Commission. Ordinarily, "[i]ssues not raised [before the Industrial Commission] and presented for the first time on appeal will not be considered for review." *Higgins*, 145 Idaho at 6, 175 P.3d at 168. However, the Commission lacks jurisdiction to resolve constitutional questions. *Tupper v. State Farm Ins.*, 131 Idaho 724, 729, 963 P.2d 1161, 1166 (1998). The Commission's ability to resolve disputes is provided for by statute. *See Owsley v. Idaho Indus. Comm'n*, 141 Idaho 129, 134, 106 P.3d 455, 460 (2005). The Idaho Employment Security Law, which created Idaho's unemployment benefits program, does not provide the Commission with authority to resolve constitutional questions relating to unemployment claims. I.C. § 72-1332 (describing authority of the Commission under the Employment Security Law); I.C. § 72-1333 (describing authority of the director of IDOL under the Employment Security Law); I.C. 72-1368 (setting out the rules for claims of unemployment benefits, appellate procedure, and limitations of actions).

For these reasons, we do not fault Allen for failing to raise a claim before the Commission that it does not have jurisdiction to resolve. As such, even though the due process issue was not presented to the Commission, we will address its merits on appeal. *See Tupper*, 131 Idaho at 729–30, 963 P.2d at 1166–67.

3. Allen's due process rights were not violated.

Allen argues that she was deprived of the process she was due based largely on the same reasons that she argued they violated the IDAPA rules governing her hearing. She adds that the Commission contributed to the deprivation of her due process rights by refusing to order a rehearing and choosing to rely on the record created before the appeals examiner.

IDOL and NCMC contend that the proceedings below were conducted in conformity with flexible due process requirements and that Allen was afforded an opportunity to be heard at a meaningful time and in a meaningful way.

The touchstone of due process "is the opportunity to be heard at a meaningful time and in a meaningful manner." *Hopkins v. Pneumotech, Inc.*, 152 Idaho 611, 615, 272 P.3d 1242, 1246 (2012) (internal quotation marks omitted) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Due process is not a rigid concept; instead, "it is a flexible concept calling for such procedural protections as are warranted by the particular situation." *Bradbury v. Idaho Judicial Council*, 136 Idaho 63, 72, 28 P.3d 1006, 1015 (2001).

12

As we have concluded that the appeals examiner did not conduct Allen's hearing improperly, we also conclude that Allen was provided with an opportunity to be heard at a meaningful time and in a meaningful manner. While this alone would be enough to satisfy procedural due process requirements, the Commission provided Allen with additional due process protections by allowing her to file a brief raising her concerns with the appeals examiner's impartiality. Although the Commission did not grant Allen's request for a rehearing, it provided Allen with an additional opportunity to be heard on this issue. As such, we hold that the proceedings below satisfied Allen's rights to procedural due process.

## C. Allen did not preserve her public policy argument.

Allen next contends that the appeals examiner and the Commission acted contrary to Idaho Code section 72-1302, which sets forth Idaho's public policy concerning unemployment benefits. NCMC and IDOL argue that Allen has not preserved this argument because she has raised for the first time on appeal. Allen argues that she may raise her public policy argument because no violation of public policy occurred until after the Commission, as the "ultimate fact finder" rendered its decision.

This Court will generally not consider issues raised on appeal that were not presented to the Commission in, the first instance. *Tupper*, 131 Idaho at 729, 963 P.2d at 1166. Here, Allen did not raise her public policy argument in her brief to the Commission, nor did she discuss it in her notice of appeal to the Commission in which she requested a rehearing. We are not persuaded by Allen's contention that she could wait to raise her public policy argument until after the Commission issued its decision. Allen has not alleged the Commission took a distinct action that violated public policy. Instead, her public policy argument focuses on the perceived impropriety of the appeals examiner, which she contends the Commission failed to correct. Allen's failure to present her argument to the Commission deprived the Commission of the opportunity to analyze and respond to this argument. Accordingly, we will not consider Allen's public policy argument because she did not raise it before the Commission.

## D. Neither party is entitled to attorney fees on appeal, but Allen is awarded costs on appeal.

Allen seeks attorney fees against both IDOL and NCMC under Idaho Code section 12-117. Under section 12-117, this Court may award attorney fees to the prevailing party in a proceeding involving a state agency if we "find[] that the nonprevailing party acted without a reasonable basis in fact or law." I.C. § 12-117(1). Section 12-117 does not allow for the recovery

of attorney fees between two non-governmental entities. *Citizens Against Linscott/Interstate Asphalt Plant v. Bonner Cnty. Bd. of Comm'rs*, 168 Idaho 705, 720–21, 486 P.3d 515, 530–31 (2021). Further, "[n]o fees are available against a party that presents a 'legitimate question for this Court to address.'" *Arambarri v. Armstrong*, 152 Idaho 734, 740, 274 P.3d 1249, 1255 (2012) (quoting *Lane Ranch P'ship v. City of Sun Valley*, 145 Idaho 87, 91, 175 P.3d 776, 780 (2007)).

As NCMC is non-governmental entity, Allen is unable to recover attorney fees against it. As for IDOL, while we remand the Commission's decision affirming the appeals examiner's eligibility determination, we do not find that IDOL acted without a reasonable basis in fact or law in defending this appeal. Consequently, we decline to award Allen attorney fees under section 12-117.

## V.    CONCLUSION

For the above reasons, we vacate the Commission's decision and remand this matter for further proceedings before the Commission. We decline to award attorney fees on appeal but award Allen costs on appeal.

Chief Justice BEVAN and Justices BRODY, STEGNER, and MOELLER **CONCUR.**